******************************************************

The "officially released" date that appears near the
beginning of an opinion is the date the opinion will be
published in the Connecticut Law Journal or the date it
is released as a slip opinion. The operative date for the
beginning of all time periods for the filing of postopinion
motions and petitions for certification is the "officially
released" date appearing in the opinion.

All opinions are subject to modification and technical
correction prior to official publication in the Connecti-
cut Law Journal and subsequently in the Connecticut
Reports or Connecticut Appellate Reports. In the event
of discrepancies between the advance release version of
an opinion and the version appearing in the Connecticut
Law Journal and subsequently in the Connecticut Reports
or Connecticut Appellate Reports, the latest version is
to be considered authoritative.

The syllabus and procedural history accompanying an
opinion that appear in the Connecticut Law Journal and
subsequently in the Connecticut Reports or Connecticut
Appellate Reports are copyrighted by the Secretary of the
State, State of Connecticut, and may not be reproduced
or distributed without the express written permission of
the Commission on Official Legal Publications, Judicial
Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* RODNEY HARVEY (AC 46771)

Alvord, Moll and Wilson, Js.

*Syllabus*

Convicted, after a jury trial, of various crimes, including assault in the second degree and assault in the second degree as an accessory, in connection with the stabbings of two victims, M and D, the defendant appealed. During an altercation in M's residence, which lasted approximately one minute, the defendant stabbed M repeatedly while another man, H, attacked D, and, after the defendant yelled for help, H began stabbing M. Approximately two years after the incident, D sent M a newspaper article containing photographs of the defendant and H and indicating that they had been arrested in connection with the stabbings. Several months later, the lead detective on the case contacted M and obtained a written statement from him indicating that the men in the newspaper article were the same men who had assaulted him and D. On appeal, the defendant claimed, inter alia, that his conviction of and subsequent punishment for both assault in the second degree and assault in the second degree as an accessory violated the constitutional prohibition against double jeopardy. *Held*:

The defendant's conviction of and subsequent punishment for both assault in the second degree and assault in the second degree as an accessory violated the constitutional prohibition against double jeopardy, as the evidence reflected that the stabbings arose from a continuous course of conduct, they were based on the same act or transaction for double jeopardy purposes and, thus, they implicated the prohibition against multiple punishments for a single act; accordingly, this court vacated the defendant's conviction of assault in the second degree as an accessory.

The evidence was sufficient to support the defendant's conviction of assault in the first degree as an accessory with respect to the stabbing of D, as the evidence supported a finding that the defendant and H communicated with one another, traveled to the city in which M lived, and engaged in assaultive conduct in M's residence as part of a criminal enterprise to steal certain drugs from M, and, thus, the defendant intentionally aided H to engage in the conduct that constituted the offense of assault in the first degree against D, and the jury reasonably could have found beyond a reasonable doubt that, because the defendant and H engaged in the coordinated stabbing attack against both victims in furtherance of their goal to steal illegal drugs, the defendant acted with the intent to cause serious physical injury to D.

The trial court properly denied the defendant's motion to suppress evidence of M's out-of-court identification of him in the newspaper article, as the record supported the court's finding that the identification was not the product of state action and, therefore, it did not violate the defendant's due process rights under the federal constitution.

The trial court properly denied the defendant's motion to suppress M's in-court identification of him because the identification did not violate the defendant's right to due process, as the in-court identification was not a first-time identification, the previous out-of-court identification did not involve state action, and, although the prescreening requirement set forth in *State* v. *Dickson* (322 Conn. 410) was not applicable because there was an absence of an unduly suggestive procedure conducted by a state actor, the court nonetheless prescreened the in-court identification because it found that the out-of-court identification procedure, although unnecessarily suggestive, was reliable and, thus, allowed for the in-court identification to take place.

The trial court did not err in concluding that the evidence related to M's identifications of the defendant was reliable, as the court's findings with respect to the factors upon which it relied to determine the reliability of M's out-of-court identification were all supported by the evidence and by law, and, in light of this court's conclusion that the trial court did not err in determining that the out-of-court identification was reliable, the defendant was unable to demonstrate that the trial court improperly concluded that the in-court identification was not reliable because it was the product of, or was tainted by, the unnecessarily suggestive out-of-court identification procedure that occurred in this case.

The trial court properly exercised its discretion in denying the defendant's motion for a new trial based on certain evidence that the prosecution suppressed, as, although the prosecution suppressed evidence after a request by the defense and that evidence was favorable to the defense, this court was not persuaded that the suppressed evidence, which tended to undermine an investigating detective's credibility but was factually unrelated to the events underlying the defendant's conviction, would have cast the case in a different light altogether or that the absence of the evidence deprived the defendant of a fair trial so as to constitute a violation of *Brady* v. *Maryland* (373 U.S. 83).

Argued May 28, 2025—officially released June 2, 2026

*Procedural History*

Substitute information charging the defendant with the crimes of attempt to commit robbery in the first degree, assault in the first degree as an accessory, assault in the second degree as an accessory, assault in the second degree, and conspiracy to commit assault in the first degree, brought to the Superior Court in the judicial district of Danbury, where the court, *Pavia, J.*, denied the defendant's motion to suppress certain evidence; thereafter, the case was tried to the jury before *Pavia, J.*; verdict and judgment of guilty; subsequently, the court, *Pavia, J.*, denied the defendant's motion for a new

trial, and the defendant appealed to this court. *Affirmed in part*; *vacated in part*.

*Pamela S. Nagy*, supervisory assistant public defender, for the appellant (defendant).

*Denise B. Smoker*, senior assistant state's attorney, with whom, on the brief, were *David Applegate*, state's attorney, and *Kristin Chiriatti*, assistant state's attorney, for the appellee (state).

*Opinion*

WILSON, J. The defendant, Rodney Harvey, appeals from the judgment of conviction, rendered following a jury trial, of attempt to commit robbery in the first degree in violation of General Statutes §§ 53a-49 and 53a-134 (a)(1), assault in the first degree as an accessory in violation of General Statutes §§ 53a-8 and 53a-59 (a) (1), assault in the second degree as an accessory in violation of General Statutes §§ 53a-8 and 53a-60 (a) (2), assault in the second degree in violation of § 53a-60 (a) (2), and conspiracy to commit assault in the first degree in violation of General Statutes §§ 53a-48 and 53a-59 (a) (1).[1] The defendant claims that (1) his conviction of and subsequent punishment for both assault in the second degree as an accessory and assault in the second degree

[1] The court imposed a total effective sentence consisting of thirty years of incarceration, execution suspended after fifteen years, followed by five years of probation. For the conviction under count one for attempted robbery in the first degree, the court sentenced the defendant to serve fifteen years of incarceration, suspended after seven and one-half years, followed by five years of probation. For the conviction under count two for assault in the first degree as an accessory, the court sentenced the defendant to serve fifteen years of incarceration, execution suspended after seven and one-half years, followed by five years of probation. The court ordered that the sentences imposed under counts one and two run consecutively. For the convictions under counts three, four, and five, for assault in the second degree as an accessory, assault in the second degree as a principal, and conspiracy to commit assault in the first degree, respectively, the court sentenced the defendant to serve five years of incarceration. The court ordered that the sentences imposed under counts three, four, and five run concurrently with the consecutive sentences imposed under counts one and two.

as a principal violates the constitutional prohibition against double jeopardy, **(2)** the evidence was insufficient to support his conviction of assault in the first degree as an accessory, **(3)** the court improperly admitted evidence of in-court and out-of-court identifications of him by one of the victims, and **(4)** the court erred in denying his motion for a new trial based on material evidence that the prosecution suppressed in violation of *Brady* v. *Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 **(1963)**. We agree with the defendant's claim that, under the circumstances of the present case, his conviction of assault in the second degree both as a principal and as an accessory violates the prohibition against double jeopardy. By way of relief, we vacate the defendant's conviction of assault in the second degree as an accessory.[2] We disagree with the defendant's remaining claims and, thus, affirm the judgment in all other respects.

On the basis of the evidence presented at trial, the jury reasonably could have found the following facts. At all times relevant, Richard Mongero resided in a two-story house in Danbury. Mongero used illegal drugs and had a criminal history. He earned money, in part, by selling prescription codeine promethazine cough syrup, known as "lean," which he obtained by fraudulent means. Approximately one week prior to May 23, 2018, Mongero sold lean to Diego Trejo, whom he knew as "Nick" or "Lean Lick." On May 23, 2018, Mongero arranged for Trejo to come to his home at 12:30 p.m. to make another purchase. Mongero communicated with Trejo by cell phone throughout the day. Trejo did not arrive at Mongero's home until 6:30 p.m. A few minutes prior to Trejo's arrival, Thomas DeSantis, Mongero's friend and coworker, arrived. DeSantis told Mongero that "some guys" were waiting outside for him. Although Mongero was expecting only Trejo, he asked DeSantis to let them in.

---

[2]The defendant also claims that the evidence was insufficient to support his conviction of assault in the second degree as an accessory. Because, in connection with the defendant's double jeopardy claim, we vacate the conviction for assault in the second degree as an accessory, it is unnecessary for us to reach the merits of this claim.

Soon thereafter, Trejo entered Mongero's upstairs bedroom accompanied by the defendant and Collin Hedley, both of whom were unknown to Mongero. Hedley asked Mongero if he had any marijuana wax for sale. Mongero stood up and removed some marijuana wax from his pocket, and Hedley nodded to the defendant and Trejo. At that moment, the defendant rushed toward Mongero, and Hedley attempted to strike DeSantis. Mongero reacted by punching the defendant, and they both fell backward into a recliner. The defendant, who was positioned face-to-face on top of Mongero with his knees in Mongero's lap, stabbed Mongero in the right side of his body with a utility knife. Mongero quickly realized that there was a knife deep inside of him.

Mongero and the defendant struggled as they both attempted to gain control of the knife. Mongero removed the knife from his side and stabbed the defendant in the stomach, which caused the defendant to yell, "Get him the fuck off me." During the defendant's altercation with Mongero, Hedley physically attacked DeSantis by stabbing him multiple times with a stiletto knife. When the defendant yelled, "Get him the fuck off me," Hedley responded by stabbing Mongero in the back. Trejo did not physically assault either Mongero or DeSantis, but he directed the defendant and Hedley to "fuck [them] up" and to "get everything." At one point during the altercation, Trejo attempted to put a bag full of Xanax pills into his pocket before Mongero intervened and pulled the bag away from him. The altercation in the bedroom lasted approximately one minute and it ended when Hedley shouted, "[L]et's go." Mongero chased Trejo out of the house before going back inside to assist DeSantis, who was still upstairs with the defendant and Hedley.

When he entered the front door, Mongero saw the defendant and Hedley at the top of the staircase that led to the second floor and his bedroom. The perpetrators, followed by Mongero, made their way downstairs and exited the home through French doors that led from a dining room to an outdoor porch that was raised off of

the ground. Because there were no stairs leading from the porch to the ground, the defendant and Hedley attempted to flee by crawling over the wooden railing on the porch. Mongero kicked the railing until it broke, and the defendant and Hedley fell to the ground below. Like Trejo, the defendant and Hedley fled from Mongero's yard on foot. Later, the three men left the area together in an automobile.

Mongero and one of his neighbors called 911. Police and emergency medical personnel arrived, and Mongero and DeSantis were transported by ambulance to Danbury Hospital where they were treated for multiple physical injuries they sustained during the incident, some of which were life-threatening in nature. Mongero's injuries included stab wounds to his right lower abdomen, neck, back and elbow. DeSantis' various injuries included stab wounds, including a puncture wound that required open-heart surgery. Additional facts and procedural history will be set forth as necessary.

I

First, the defendant claims that his conviction of and subsequent punishment for both assault in the second degree as an accessory and assault in the second degree as a principal violate the constitutional prohibition against double jeopardy. We agree.

In count three of the state's second amended long form information, the state charged the defendant with assault in the second degree as an accessory in that, "on or about May 23, 2018, at 13 Windaway Road, Danbury, with intent to cause physical injury to another person, [the defendant] solicited, requested, commanded, importuned and intentionally aided another person to engage in conduct where the other person, Collin Hedley, with intent to cause physical injury to another person, caused such injury to another person, to wit: Richard Mongero, by means of a dangerous instrument, to wit: a knife-like instrument, in violation of . . . §§ 53a-8 and 53a-60 (a) (2)." In count four of the state's second amended long

form information, the state charged the defendant with assault in the second degree as a principal in that, "on or about May 23, 2018, at 13 Windaway Road, Danbury, with intent to cause physical injury to another person, [the defendant] caused such injury to another person, to wit: Richard Mongero, by means of a dangerous instrument, to wit: a knife-like instrument, in violation of . . . § 53a-60 (a) (2)."

The defendant argues that the evidence reflects that Mongero sustained stab wounds "during a single, continuous course of conduct. Mongero was stabbed by both men in a matter of seconds, and the stabbings took place in the same location—his bedroom. There was also no break or intervening event between the stabbings. . . . Mongero and the defendant were fighting over the knife and when the defendant yelled for someone to get Mongero off him, Hedley stabbed him." The defendant argues that, because the evidence reflects that the stabbings arose from a continuous course of conduct, they are based on the same act or transaction for double jeopardy purposes and, thus, implicate the prohibition against multiple punishments for a single act. The defendant argues that the proper remedy is to vacate his conviction under either count three or count four.

The defendant asserts, and we agree, that he did not preserve this claim at trial. The defendant seeks review under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015). Under *Golding*, "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: **(1)** the record is adequate to review the alleged claim of error; **(2)** the claim is of constitutional magnitude alleging the violation of a fundamental right; **(3)** the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and **(4)** if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." **(Emphasis**

in original; footnote omitted.) *State* v. *Golding*, supra, 239–40; see also *In re Yasiel R.*, supra, 317 Conn. 781 (modifying third prong of *Golding*). The claim is reviewable under *Golding* because the claim is of constitutional magnitude alleging the violation of a fundamental right; see *State* v. *Barber*, 64 Conn. App. 659, 671, 781 A.2d 464 ("[i]f double jeopardy claims arising in the context of a single trial are raised for the first time on appeal, these claims are reviewable" (internal quotation marks omitted)), cert. denied, 258 Conn. 925, 783 A.2d 1030 (2001); and the record permits us to review the claim.

Before evaluating the claim under *Golding*'s third prong to determine whether the alleged constitutional violation exists and deprived the defendant of a fair trial, we set forth the applicable legal principles. "A defendant's double jeopardy claim presents a question of law, over which our review is plenary." (Internal quotation marks omitted.) *State* v. *Bernacki*, 307 Conn. 1, 9, 52 A.3d 605 (2012), cert. denied, 569 U.S. 918, 133 S. Ct. 1804, 185 L. Ed. 2d 811 (2013). "The double jeopardy clause of the fifth amendment to the United States constitution provides: [N]or shall any person be subject for the same offense to be twice put in jeopardy of life or limb . . . . This constitutional provision is applicable to the states through the due process clause of the fourteenth amendment. . . . The Connecticut constitution provides coextensive protection, with the federal constitution, against double jeopardy." (Internal quotation marks omitted.) *State* v. *Ragalis*, 235 Conn. App. 538, 559, 345 A.3d 844, cert. denied, 353 Conn. 934, 347 A.3d 877 (2025).

"Double jeopardy prohibits not only multiple trials for the same offense, but also multiple punishments for the same offense. . . . We have articulated two different approaches to the double jeopardy analysis of multiple punishments. Which approach applies in any given case depends on the statutory basis of the underlying charges. When the defendant is charged with the violation of two distinct statutes in a single criminal proceeding

arising from a single underlying set of events, we have employed a two part analysis. First, the charges must arise out of the same act or transaction. Second, it must be determined whether the charged crimes are the same offense. Multiple punishments are forbidden only if both conditions are met. . . . We [t]raditionally . . . have applied the . . . test [set forth in *Blockburger* v. *United States*, 284 U.S. 299, 304, 52 S. Ct. 180, 76 L. Ed. 306 (1932)] to determine whether two statutes criminalize the same offense, thus placing a defendant prosecuted under both statutes in double jeopardy: [W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not. . . .

"In contrast, [t]he proper double jeopardy inquiry when a defendant is convicted of multiple violations of the same statutory provision is whether the legislature intended to punish the individual acts separately or to punish only the course of action which they constitute. . . . This analysis essentially asks what unit of prosecution the legislature intended as the punishable act under the statute. . . . The unit of prosecution analysis involves an effort to determine the legislature's intent as to whether and how a course of prohibited conduct can be separat[ed] into parts, each of which in itself constitutes a completed offense. . . . In some instances, the legislature will intend to punish a continuous course of conduct as a single unit of prosecution. . . . In other instances, the legislature intends to punish separately each discrete act that constitutes a completed offense. . . .

"Selecting between these two approaches is simple enough in the ordinary case because it will be clear whether the defendant stands charged with violating two different criminal statutes or two violations of the same criminal statute." (Citations omitted; emphasis omitted; footnotes omitted; internal quotation marks omitted.) *State* v. *Ruiz-Pacheco*, 336 Conn. 219, 226–29, 244 A.3d 908 (2020).

In the present case, the defendant was convicted of assault in the second degree as a principal offender under § 53a-60 (a) (2) and as an accessory under §§ 53a-8 and 53a-60 (a) (2). The state alleged that Mongero was the victim of both offenses. Because Connecticut law treats the two violations as alternative means of committing the same crime, they arise under the same substantive criminal statute for double jeopardy purposes. See id., 229 (concluding that conviction of assault in first degree as *principal offender* in violation of General Statutes § 53a-59 (a) (1) and conviction of assault in first degree as *accessory* in violation of §§ 53a-59 (a) (1) and 53a-8 arise under same substantive criminal statute for double jeopardy purposes). As our Supreme Court has explained, "although a separate and distinct provision in our criminal statutes defines a category of conduct commonly known as accessory liability, [t]here is no such crime as *being an accessory* . . . . The accessory statute merely provides alternate means by which a substantive crime may be committed." (Emphasis in original; internal quotation marks omitted.) Id.

"To determine whether the defendant's multiple assault convictions [under the same criminal statute] violate the double jeopardy clause, we must ascertain the unit of prosecution that the legislature intended to punish under [the criminal statute at issue]. . . . This is because [t]he role of the constitutional guarantee [against double jeopardy] is limited to [en]suring that the court does not exceed its legislative authorization by imposing multiple punishments for the same offense. . . . The issue, though essentially constitutional, becomes one of statutory construction." (Citation omitted; internal quotation marks omitted.) Id., 231. Issues of statutory construction are afforded plenary review. Id., 232.

"When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case . . . .

In seeking to determine that meaning, General Statutes § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered." (Internal quotation marks omitted.) Id.

Section 53a-60 (a) (2) provides: "A person is guilty of assault in the second degree when . . . with intent to cause physical injury to another person, the actor causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument other than by means of the discharge of a firearm . . . ." The issue concerning the interpretation of the statute was resolved in *State* v. *Nixon*, 92 Conn. App. 586, 886 A.2d 475 (2005), in which this court, in resolving a double jeopardy claim arising from multiple assault convictions arising under § 53a-60 (a) (2), concluded that § 53a-60 (a) (2) did not reflect a legislative intent that each act of stabbing constitutes a separate, complete, and chargeable offense. Id., 589–97. We are bound by that interpretation of the statute and, "[i]n the absence of a clear legislative intent to impose multiple punishments for violations of the same criminal statute arising out of a single transaction or occurrence, the unit of prosecution question must be resolved in favor of the rule of lenity." *State* v. *Ruiz-Pacheco*, supra, 336 Conn. 236.

Our unit of prosecution analysis forbids us from treating each stabbing as a separate crime and, applying the rule of lenity, we must avoid turning a single transaction into multiple offenses. This conclusion, however, does not end our analysis for double jeopardy purposes. We next consider whether, as the defendant argues, his repetitive stabbing of Mongero during the events of May 23, 2018, occurred during a single, continuous course of conduct or whether, as the state argues, the facts reflect two separate courses of assaultive conduct. In a careful consideration of the record, we must "look to the

following factors to determine whether . . . the defendant engaged in distinct courses of conduct and, therefore, separately punishable assaults as to each victim: **(1)** the amount of time separating the acts; **(2)** whether the acts occurred at different locations; **(3)** the defendant's intent or motivation behind the acts; and **(4)** whether any intervening events occurred between the acts, such that the defendant had the opportunity to reconsider his actions." Id., 241.

The evidence reflects, and the parties do not disagree, that the stabbing incident involving Mongero lasted approximately one minute,[3] and it occurred in one location, Mongero's bedroom. The parties disagree, however, with respect to the defendant's intent and whether intervening events occurred between the stabbings, such that the defendant had an opportunity to reconsider his actions. Mongero testified that, when the incident began, the defendant fell on top of him, essentially pushing him into the recliner in his bedroom. The defendant positioned himself on Mongero's lap so that he was face-to-face with Mongero, at which time he stabbed him. Mongero testified that he physically struggled with the defendant, eventually standing up and pulling the knife from his side. Mongero testified that "[he] pulled it out and we fought over it and I inserted it in him." According to Mongero, "[t]hen we fought over it and continued to fight . . . for the possession of the knife, whereas then I started to be attacked from the back by [Hedley], stabbed in the neck and the back." Mongero testified that, while this scuffle was occurring, the defendant began yelling "get him the fuck off me. . . . [T]hat's when I started to be stabbed by [Hedley]. . . . [Because] I was protecting myself."

According to the state, the foregoing testimony reflects that distinct acts occurred, "in the first, the defendant [was] stabbing Mongero in the side and in the second, [the defendant was] yelling, [g]et him the fuck off me, causing Hedley to stab Mongero in the back. The two

[3] DeSantis testified that the attack lasted "[a]bout a minute."

assaults, one as principal and one as accessory, are thus susceptible of separation into parts, each of which in itself constitutes a completed offense and not part of the same continuing course of conduct." (Internal quotation marks omitted.) The state also argues that "the defendant certainly had the opportunity to reconsider his actions . . . when Mongero got his hands on the knife and fought back. . . . Instead of releasing the knife and abandoning the attack, he opted to call for assistance . . . demonstrating that he had formed a new, separate criminal intent." (Citations omitted; internal quotation marks omitted.)

Contrary to the state's arguments, we are not persuaded that, when Mongero took control of the knife and the defendant asked for help, the defendant formed a new, separate criminal intent. The defendant's statement, "[g]et him the fuck off me," did not occur during a break in the action, but was a reaction in the heat of an uninterrupted physical struggle that transpired in one location and lasted for approximately one minute. Importantly, after Hedley responded and began stabbing Mongero, the defendant did not engage in separate conduct, such as by restraining Mongero to aid the assault being committed by Hedley, which would have reflected that he had formed a separate intent. In light of all of the circumstances, the evidence that the defendant asked for help during this brief physical assault also does not cause us to conclude that he had even a brief opportunity to reconsider his actions, but merely that he sought assistance because Mongero had gained control of the defendant's knife. Cf. *State* v. *Ruiz-Pacheco*, supra, 336 Conn. 244–45 (two distinct courses of conduct occurred for double jeopardy purposes because "the defendant's stabbings of [the victim] are distinguished by the break in the fighting, the movement from one area of the parking lot to another, and the defendant's own articulation of a distinct criminal intent"). Accordingly, we are not persuaded that it is appropriate to treat the defendant's actions as two separate instances of assaultive conduct for purposes of double jeopardy.

The defendant has demonstrated under *Golding*'s third prong that a constitutional violation exists that deprived him of a fair trial. The state has not attempted to demonstrate under *Golding*'s fourth prong that the violation is harmless beyond a reasonable doubt. Although, in this case, the court sentenced the defendant to serve a concurrent sentence for both assault in the second degree offenses, "we recognize that the conviction of both of the separate offenses, in their own right, impermissibly harms the defendant." (Internal quotation marks omitted.) *State* v. *Purvis*, 227 Conn. App. 188, 220, 321 A.3d 1158, cert. denied, 350 Conn. 922, 325 A.3d 1093 (2024). The appropriate remedy is to vacate the defendant's conviction of assault in the second degree as an accessory.[4] See, e.g., *State* v. *Ruiz-Pacheco*, supra, 336

[4]By way of relief in connection with this double jeopardy claim, the defendant asks this court to vacate one of the convictions for assault in the second degree. He does not ask this court to remand the case to the trial court for resentencing. Although we vacate the defendant's conviction under count three, we do not require the court to resentence the defendant.

Our Supreme Court has explained that, when one or more parts of a multicount conviction is vacated by a reviewing court, "common sense dictates that the [sentencing] judge should be free to review the efficacy of what remains in light of the original plan, and to reconstruct the sentencing architecture . . . within applicable constitutional and statutory limits, if that appears necessary in order to ensure that the punishment still fits both crime and criminal. . . . When we endorsed the Appellate Court's adoption of the aggregate package theory, we explained that a defendant in appealing his conviction and punishment, has voluntarily called into play the validity of the entire sentencing package . . . ." (Internal quotation marks omitted.) *State* v. *Johnson*, 316 Conn. 34, 41, 111 A.3d 447 (2015). Further, "[a]lthough the [trial] court may reconstruct the sentencing package to conform to its original intent, it is not required to do so. It may, therefore, simply eliminate the sentence previously imposed for the vacated conviction, and leave the other sentences intact; or it may reconstruct the sentencing package so as to reach a total effective sentence that is less than the original sentence but more than that effected by the simple elimination of the sentence for the vacated conviction. The guiding principle is that the court may resentence the defendant to achieve a rational, coherent [sentence] in light of the remaining convictions, as long as the revised total effective sentence does not exceed the original." (Internal quotation marks omitted.) Id., 41–42. Moreover, the court in *Johnson* observed that "the trial court always retains authority to restructure the original sentence if the court determines that the judgment of the reviewing court altered its original sentencing intent [and] . . . in a case in which the judgment of the reviewing court does not change

Conn. 242–43 (in light of double jeopardy violation aris-
ing from conviction for assault in first degree and assault
in first degree as accessory, proper remedy is to reverse
conviction for assault in first degree as accessory).

## II

Next, the defendant claims that the evidence was insuf-
ficient to support his conviction of assault in the first
degree as an accessory. We are not persuaded.

In count two of its second amended long form infor-
mation, the state charged the defendant with assault in
the first degree as an accessory in that, "on or about May
23, 2018, at 13 Windaway Road, Danbury, with intent
to cause serious physical injury to another person, [the
defendant] solicited, requested, commanded, impor-
tuned and intentionally aided another person to engage

the total effective sentence, the reviewing court should not order the
trial court to resentence a defendant on the remaining convictions
unless there is some evidence or other basis in the record supporting
the conclusion that the judgment of the reviewing court altered the
original sentencing intent. Adopting a default rule requiring the trial
court to revisit the entire sentence, even when there is no evidence in
the record suggesting that the court's original sentencing intent was
affected by the decision of the reviewing court, would waste valuable
judicial resources." Id., 42–43. In determining whether a trial court's
original sentencing intent has been disturbed, it is appropriate for the
reviewing court to consider whether its decision had any effect on the
total effective sentence or any of the conduct that served as the predicate
for the original sentence. Id., 43–44.

In the present case, for each of the convictions under counts three,
four, and five, for assault in the second degree as an accessory, assault
in the second degree as a principal, and conspiracy to commit assault
in the first degree, respectively, the court sentenced the defendant to
serve five years of incarceration. The court ordered that the sentences
imposed under counts three, four, and five run concurrently to the con-
secutive sentences imposed under counts one and two. See footnote 1 of
this opinion. Vacating the conviction imposed under count three does
not alter the defendant's total effective sentence, as the total effective
sentence is based on the same conduct on which the court relied in the
first instance, and there is no other basis on which to conclude that the
trial court's original sentencing intent has been disturbed. The trial
court retains the authority to restructure the defendant's entire sen-
tence if it determines that doing so is necessary to retain its original
sentencing intent. See *State* v. *Johnson*, supra, 316 Conn. 42–43; see
also *State* v. *Fox*, 192 Conn. App. 221, 230, 217 A.3d 41 (it was unnec-
essary to remand case to trial court for resentencing because vacatur
of defendant's conviction would not alter his total effective sentence),
cert. denied, 333 Conn. 946, 219 A.3d 375 (2019).

in conduct where the other person, Collin Hedley, with intent to cause serious physical injury to another person, caused such injury to another person, to wit: Thomas DeSantis by means of a dangerous instrument, to wit: a knife-like instrument, in violation of . . . §§ 53a-8 and 53a-59 (a) (1)." The defendant claims that the evidence was insufficient to sustain his conviction of this offense because "[t]here was absolutely no evidence that [he] acted as an accessory to the assault on DeSantis as alleged in count two. The evidence was clear that Hedley attacked DeSantis, and there was no evidence that the defendant aided Hedley or intended to physically injure DeSantis." The defendant contends that evidence of his mere presence at the crime scene, and the absence of evidence that he "somehow helped Hedley and intended to aid him to cause physical injury to DeSantis," was insufficient to prove his guilt under a theory of accessorial liability. The defendant asks this court to vacate his conviction.[5]

We begin our analysis by setting forth the essential elements of the offense, as well as the applicable legal principles. Section 53a-59 (a) provides in relevant part: "A person is guilty of assault in the first degree when: (1) With intent to cause serious physical injury to another person, he causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument . . . ." Here, the defendant was charged not as a principal offender, but as an accessory. Section

_____

[5]Defense counsel moved for a judgment of acquittal at the close of the state's case-in-chief, which the court denied. In connection with that motion, defense counsel did not distinctly raise the arguments that the defendant raises in connection with this claim. Before this court, the defendant argues that this claim is reviewable under *State* v. *Golding*, supra, 213 Conn. 239–40. Our Supreme Court, however, has "observed that any defendant found guilty on the basis of insufficient evidence has been deprived of a constitutional right, and would therefore necessarily meet the four prongs of *Golding*. . . . Accordingly, because there is no practical significance . . . for engaging in a *Golding* analysis, we review an unpreserved sufficiency of the evidence claim as though it had been preserved." (Citation omitted; internal quotation marks omitted.) *State* v. *Revels*, 313 Conn. 762, 777, 99 A.3d 1130 (2014), cert. denied, 574 U.S. 1177, 135 S. Ct. 1451, 191 L. Ed. 2d 404 (2015). Accordingly, we need not rely on *Golding* in our analysis of this claim.

53a-8 (a) provides: "A person, acting with the mental state required for commission of an offense, who solicits, requests, commands, importunes or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable for such conduct and may be prosecuted and punished as if he were the principal offender." This court has recognized that, "if the evidence, taken in the light most favorable to sustaining the verdict, establishes that [the defendant] . . . did some act which . . . directly or indirectly counseled or procured any persons to commit the offenses or do any act forming a part thereof, then the [conviction] must stand." (Internal quotation marks omitted.) *State* v. *Juarez*, 179 Conn. App. 588, 601, 180 A.3d 1015 (2018), cert. denied, 331 Conn. 910, 203 A.3d 1245 (2019). Conversely, "[o]ne who is present when a crime is committed but neither assists in its commission nor shares in the criminal intent of its perpetrator cannot be convicted as an accessory. . . . Mere presence as an inactive companion, passive acquiescence, or the doing of innocent acts which may in fact aid the one who commits the crime must be distinguished from the criminal intent and community of unlawful purpose shared by one who knowingly and wilfully assists the perpetrator of the offense in the acts which prepare for, facilitate, or consummate it." (Citation omitted; internal quotation marks omitted.) *State* v. *Bennett*, 307 Conn. 758, 770, 59 A.3d 221 (2013).

In light of the state's theory of the case, the state bore the burden of proving the following essential elements beyond a reasonable doubt: (1) Hedley, intending to cause serious physical injury to DeSantis, caused such injury to DeSantis by means of a deadly weapon or a dangerous instrument; (2) the defendant solicited, requested, commanded, importuned, or intentionally aided Hedley to engage in the conduct that constituted the offense of assault in the first degree; and (3) the defendant acted with the intent to cause serious physical injury to DeSantis.

"The standard of review we apply to a claim of insufficient evidence is well established. In reviewing the sufficiency of the evidence to support a criminal conviction we apply a [two part] test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether [on] the facts so construed and the inferences reasonably drawn therefrom the [jury] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . .

"We note that the jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, [but] each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt. . . .

"Moreover, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact, but the cumulative impact of a multitude of facts [that] establishes guilt in a case involving substantial circumstantial evidence. . . . In evaluating evidence, the [jury] is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The [jury] may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical. . . .

"Finally, [a]s we have often noted, proof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the [jury], would have resulted in an acquittal. . . . On appeal,

we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [jury's] verdict of guilty." (Internal quotation marks omitted.) *State* v. *Brown*, 345 Conn. 354, 369–70, 285 A.3d 367 (2022). As we review the relevant evidence, we are mindful that "[t]he jury is entitled to draw reasonable inferences from the evidence before it and, in performing its function, the jury brings to bear its common sense and experience of the affairs of life. . . . It is often said that common sense is not left at the courthouse door." (Citation omitted; internal quotation marks omitted.) *State* v. *Flowers*, 161 Conn. App. 747, 757, 129 A.3d 157 (2015), cert. denied, 320 Conn. 917, 131 A.3d 1154 (2016).

The evidence and the reasonable inferences drawn therefrom reflect that, during the afternoon prior to the incident at Mongero's residence, the defendant, Hedley, and Trejo were in communication via their cell phones. Trejo already had arranged to meet Mongero, at his residence, for the purpose of making another purchase of an illegal drug. The defendant, Hedley, and Trejo were driven to Mongero's residence by a female. After their automobile approached Mongero's residence at a high rate of speed, the driver allowed the defendant, Hedley, and Trejo to exit the automobile a short distance from the residence. The driver of the automobile followed closely behind them as they walked to the residence. The driver of the automobile then repeatedly circled the neighborhood waiting for their return. After leaving Mongero's residence, the defendant, Hedley, and Trejo were quickly driven away from the neighborhood together.

The defendant and Hedley each entered Mongero's residence armed with a knife. Once in Mongero's bedroom, Hedley nodded to the defendant and Trejo. Immediately after, Hedley attempted to strike DeSantis before stabbing him repeatedly, and the defendant rushed toward Mongero before stabbing him repeatedly. Trejo

remained, encouraging the defendant and Hedley to "fuck [them] up" and to "get everything." Trejo tried to steal some of the drugs in Mongero's bedroom. Once Hedley shouted, "let's go," the physical altercations came to an end, and the defendant, Hedley, and Trejo left the residence and found their way to the automobile that was waiting for them.

The evidence did not demonstrate that the defendant threatened, injured, or attempted to injure DeSantis. That, however, was not the state's burden to prove. In light of the subordinate facts, supported by the evidence presented at trial, the jury reasonably could have found that the defendant, Hedley, and Trejo communicated with one another, traveled to Danbury, and engaged in assaultive conduct in Mongero's residence as part of a criminal enterprise to steal illegal drugs from Mongero. Although the evidence suggests that DeSantis was unknown to the defendant, Hedley, and Trejo prior to the events at issue, the defendant and Hedley nonetheless acted in unison to inflict serious physical injuries on DeSantis and Mongero by means of the concealed knives in their possession in furtherance of that shared criminal enterprise.

There is no dispute that Hedley, intending to cause serious physical injury to DeSantis, caused such injury to DeSantis by means of a deadly weapon or a dangerous instrument. Contrary to the defendant's arguments, the evidence supported a finding that the defendant intentionally aided Hedley to engage in the conduct that constituted the offense of assault in the first degree against DeSantis because the facts support an inference that, once the defendant and Hedley encountered DeSantis in Mongero's bedroom, they engaged in a coordinated stabbing attack to subdue both victims in furtherance of their goal of stealing illegal drugs. Likewise, on these facts, the jury reasonably could have found beyond a reasonable doubt that, because the defendant and Hedley engaged in the coordinated stabbing attack against both occupants of the bedroom so that they could obtain

illegal drugs, the defendant acted with the intent to cause serious physical injury to DeSantis.

This is not a situation, as the defendant argues, in which he was a mere bystander to a crime committed by another person. The facts concerning the defendant's conduct before, during, and following the stabbing incident belie this argument. The defendant was not only armed, but he and Hedley acted in unison to subdue Mongero and DeSantis. The defendant did not flee or demonstrate his surprise when Hedley began stabbing DeSantis. Instead, when Hedley nodded his head, he aided Hedley by stabbing, and thus subduing, Mongero. This conduct prevented Mongero from interfering with Hedley's simultaneous assault of Mongero's friend and coworker, DeSantis. Thus, the defendant was neither an inactive companion, someone engaging in innocent acts, or someone who passively acquiesced while Hedley stabbed DeSantis repeatedly in his presence. He shared the criminal intent of Hedley and actively participated in a coordinated attack that resulted in serious physical injuries to both victims. For the foregoing reasons, there is a reasonable view of the evidence that supports the jury's finding beyond a reasonable doubt that the defendant, acting with the requisite mental state, intentionally aided Hedley in his assault of DeSantis. Accordingly, we reject the defendant's claim.

## III

Next, the defendant claims that the court improperly denied his motion to suppress evidence of Mongero's out-of-court and in-court identifications of him. The defendant's claim may be distilled to three distinct subclaims: **(1)** the court improperly denied his motion to suppress Mongero's out-of-court identification of him as violative of his right to due process,[6] **(2)** the court improperly denied Mongero's in-court identification of

[6]We analyze the due process arguments raised in connection with this claim under the federal constitution. The defendant has not framed his arguments under the state constitution, and he has not separately analyzed a claim under the state constitution. See *State* v. *Langley*,

him as violative of his right to due process, and **(3)** the court erred in concluding that the identification evidence was reliable. We are not persuaded.

The following additional facts are relevant to this claim. By written motion of October 6, 2021, the defendant moved to suppress an out-of-court identification of the defendant by Mongero on January 18, 2021, on the grounds that it was "unnecessarily suggestive and unreliable under the totality of the circumstances." The defendant also asked the court "to preclude any in-court identifications of the defendant by [Mongero]."

On November 10, 2021, the court held an evidentiary hearing on the motion, during which the defendant presented testimony from Mongero and Detective Justin Williams of the Danbury Police Department. Williams testified that he was the lead detective with respect to the incident that had occurred at Mongero's residence and that, following the incident, he stayed in touch with Mongero. In the immediate aftermath of the May 23, 2018 stabbing incident, Mongero provided the police with a physical description of the perpetrators. Williams testified that, in January 2021, the state's attorney's office asked him to administer a photographic array to Mongero related to this case. Williams spoke with Mongero by phone in January 2021, and Mongero told Williams that, in June 2020, DeSantis sent him a link to a January 29, 2020 article in the News-Times, a Danbury newspaper, that included information about the incident, as well as photographs of the defendant, Hedley, and Trejo. Mongero indicated that he read the article and that both he and DeSantis agreed that it had correctly identified the three perpetrators.

The article, which was admitted into evidence at the suppression hearing, stated, among other things, that the defendant, Hedley, and Trejo had been arrested in connection with the May 23, 2018 incident at Mongero's residence. In discussing the case with Mongero, Williams

128 Conn. App. 213, 218 n.2, 16 A.3d 799, cert. denied, 302 Conn. 911, 27 A.3d 371 (2011).

told him that the police had identified the defendant by means of DNA evidence. Williams believed that administering a photographic array to Mongero after he spoke with him by phone in January 2021 was not feasible because the only photograph that he had of the defendant was the same booking photograph of the defendant that appeared in the newspaper article. Williams testified that he did not administer a photographic array earlier during his investigation for various reasons, including the fact that, following the stabbing incident, Mongero had been incarcerated in the same facility as the defendant,[7] and he believed it was appropriate to take direction from the state's attorney's office, which had not asked him to obtain an identification from Mongero until January 2021.

Williams further testified that he met with Mongero on March 5, 2021, to obtain a written statement from him concerning his identifications of the defendant and Hedley, which were made in connection with the newspaper article. Mongero told Williams that he was "very positive" and had "no doubt" that the person pictured and identified as the defendant had stabbed him and that he was "100 percent" certain that the person pictured and identified as Hedley had stabbed DeSantis. Mongero told Williams (1) that the person pictured and identified as Trejo was also at the residence, and (2) what Trejo had done during the incident. Williams testified that the article did not specify the level of detail that Mongero provided with respect to the activities of each perpetrator during the stabbing incident. Furthermore, Williams testified that Mongero's identifications of the defendant and Hedley were consistent with the results of DNA testing performed on knives that the police had seized following the events at issue. In the written and sworn statement that Mongero provided to Williams, he stated in part that the person pictured and identified as

[7]At the suppression hearing, Mongero testified that, in January 2019, he pleaded guilty to a weapons charge in an unrelated case and was imprisoned for one year. His term of imprisonment ended shortly before DeSantis sent him the newspaper article.

the defendant "put a knife in my body multiple times." Mongero also stated that the person pictured and identified as Hedley "is undoubtedly the man who stabbed [DeSantis]. 100 [percent]." Williams testified that, prior to Mongero providing this identification, both Mongero and DeSantis had identified Trejo by means of a photographic array. Mongero, however, failed to identify Hedley when, in August 2018, the police asked him to review a photographic array that included a photograph of Hedley.

At the suppression hearing, Mongero testified that DeSantis had told him "off of the cuff" that the police had apprehended "the guys who tried to kill us."[8] Mongero speculated that, because DeSantis was the "main victim," DeSantis had been assisting the police in "closing the case" and that DeSantis had been "shown the article . . . ." Mongero testified that months after DeSantis sent him a link to the newspaper article, Williams contacted him and asked him if he had seen the article and whether the men identified and pictured were the perpetrators.[9] Williams then asked Mongero to email him the article so that there was no confusion about which article Mongero had seen. After Mongero stated that he recognized the people pictured in the article, Williams asked Mongero for a written statement. According to Mongero, Williams had "very little to say" about the people pictured in the article.

Mongero stated that, when DeSantis sent him the link to the article,[10] he was "blown away" because he did

---

[8]Mongero clarified that DeSantis did not express an opinion as to whether the men pictured in the article were the actual perpetrators, but merely said, "Can you believe this? Take a look at it."

[9]Mongero testified that, immediately after the stabbing incident, he was told by "law enforcement" that, if he cooperated with the police and helped them identify the perpetrators, he would not face arrest for the illegal drugs that were found in his residence by the police. Mongero also testified that he assisted the detectives working on this case "up until what they had asked me for and figured they would fade away and that was that." After he was contacted about his case in 2021, however, he contacted his attorney and entered into a cooperation agreement with the state.

[10]Mongero estimated that DeSantis sent him the link to the newspaper article, via an instant messaging app, in February 2020.

not believe that the police would apprehend any of the perpetrators. Mongero recalled instantly recognizing the people pictured, including the man who had stabbed DeSantis and the man who had stabbed him in his side. He described what transpired during the stabbing incident and the fact that he was face-to-face with the person who stabbed him in his side. He stated that he recognized the defendant because he recalled the appearance of his forehead. Mongero described the individuals pictured as his attacker, DeSantis' attacker, and the man "who set it up . . . ." Mongero testified that, after looking at the photographs, he read the article.

Mongero agreed that, at the time of the stabbing, he was on "high alert" and "paying attention" when the defendant and Hedley came to his bedroom, as he did not know them. Mongero stated that the man who pinned him against the recliner in his bedroom and stabbed him in his side was not wearing a mask, glasses, or a hat, and he recalled specific details about the man's physical appearance. Mongero testified that he provided the police with a physical description of the perpetrators both at the hospital and the following day.

Mongero testified that, at the time that he provided his written statement to Williams, he believed that the police no longer needed his help to apprehend the perpetrators involved in the stabbing incident at his residence. Mongero testified that Williams had "reaffirmed" to him that, in light of the fact that the police had obtained incriminating DNA evidence, the police had this case "in the bag."

In support of his motion to suppress, the defendant focused on the fact that Mongero identified him only after seeing his photograph in the newspaper and learning that he, Hedley, and Trejo had been arrested. The defendant also argued that the identification was not reliable when considered in light of several factors, as set forth in *State* v. *Guilbert*, 306 Conn. 218, 237–39, 49 A.3d 705 (2012), that are relevant in assessing the reliability of eyewitness

identifications.[11] The defendant also argued that, in light of the suggestive out-of-court identification, an in-court identification of him by Mongero could not satisfy the requirements of *State* v. *Dickson*, 322 Conn. 410, 141 A.3d 810 (2016), cert. denied, 582 U.S. 922, 137 S. Ct. 2263, 198 L. Ed. 2d 713 (2017), in which our Supreme Court held that, "in cases in which identity is an issue, in-court identifications that are not preceded by a successful identification in a nonsuggestive identification procedure implicate due process principles and, therefore, must be prescreened by the trial court." (Footnote omitted.) Id., 415.

The court denied the motion to suppress and, on November 16, 2021, the court, in an oral ruling, articulated the reasons for its denial. The court stated that the initial identification of the defendant by Mongero was not the result of a suggestive police procedure because "[t]he police neither solicited the witness' viewing of this photograph nor . . . requested the newspaper to publish the article in question." The court stated that when the police learned that Mongero had seen the article months later, they ended all further identification procedures based upon what they believed would have been a duplicative use of the photograph that appeared in the newspaper, which was the only photograph of the defendant in the possession of the police. Thus, the court determined that, in light of the absence of state action with respect to the identification, the defendant's federal due process rights were not infringed in this case.

The court then explained that it was necessary to determine whether the identification procedure was unnecessarily suggestive and, if so, whether the out-of-court identification could nonetheless be deemed reliable and worthy of admission. The court stated: "It is this court's opinion that the identification was in fact suggestive. The witness was told to look at the newspaper picture by . . . a fellow complainant in this particular case who

---

[11]We will discuss the factors set forth in *Guilbert* in part III C of this opinion.

stated that the picture was . . . of the guy who tried to kill us . . . .

"The friend then sent the picture directly to the witness who viewed it while reading the article and the captions associated with the pictures. While the article did provide three separate pictures, all were of men accused of having been arrested and involved in the assault at the witness' home.

"So, having found that it is in fact suggestive, the question then becomes whether or not, [not]withstanding the suggestiveness of the identification, the identification of the defendant is nonetheless reliable.

"The court will look to the totality of the circumstances and determine whether or not the suggestive procedure would give rise to a substantial likelihood of irreputable misidentification. . . .

"Applying [the factors that are relevant to the issue of reliability] to the facts of this case as presented to this court during testimony on the motion to suppress, this court finds that the witness' identification of the defendant is in fact reliable.

"[Mongero's] opportunity to view his predator during the incident himself [was] substantial. They were in close proximity to each other for a majority of the incident and at one point were in fact face-to-face. The lighting conditions were favorable. There was no obstruction or impediments to the witness' ability to be able to view the defendant.

"Although the circumstances of the event were certainly stressful, testimony was that, because the witness had only expected one person to be entering his house, when he saw multiple people, it heightened his sense[s] and he was suspicious and, therefore, was paying closer attention to the circumstances surrounding him.

"The description that the witness gave to the police at the time or in close proximity to the incident itself have remained consistent and are in fact consistent with

the description of the defendant himself. The witness' description of the defendant in fact did not change and that stands true even in light of the fact that the witness was asked by the police and participated in multiple other identification procedures where he was shown photo arrays but did not make any identification. So, there is no false identifications or identifications that later turned out not to be accurate.

"In fact, the only identification that [Mongero] did make was when he ultimately saw the picture that was in the newspaper. All of these things add to the fact that, in this court's opinion, the circumstances and the totality of the circumstances in this particular case based upon this witness' identification lead to the conclusion that it is in fact a reliable identification and, therefore, the court will deny the defendant's motion to suppress."

In addition to denying the motion to suppress with respect to the initial, out-of-court identification of the defendant by Mongero, the court also denied the motion to suppress Mongero's in-court identification of the defendant that was anticipated to occur at trial. The court, relying on *State* v. *Scott*, 191 Conn. App. 315, 214 A.3d 871, cert. denied, 333 Conn. 917, 216 A.3d 651 (2019), reasoned that, because it had determined that Mongero's initial identification was reliable, "that then necessarily does allow for the in-court identification procedure to take place, as well." The court reasoned that the defendant's reliance on *State* v. *Dickson*, supra, 322 Conn. 410, to demonstrate the existence of a due process violation was not persuasive because the initial identification made by Mongero did not involve a state actor. Moreover, the court reasoned that, even if the due process protections required by *Dickson* applied in this case, *Dickson* did not require the suppression of the in-court identification because the court at the time of the suppression hearing had prescreened the initial identification and determined that it was reliable.

After the court denied the motion to suppress, Mongero testified with respect to the events that transpired at his

residence on May 23, 2018, and the circumstances under which he had observed the three perpetrators. Consistent with his testimony at the suppression hearing, Mongero testified that he identified the defendant in the newspaper article that DeSantis sent to him. Mongero stated that, when he opened the article, and before reading its contents, "I immediately saw my attacker . . . when I looked [at] it." The photographs from the article were admitted into evidence. Mongero identified the defendant's photograph to depict the person who stabbed him, Hedley's photograph to depict the person who stabbed DeSantis, and Trejo's photograph to depict the person who he knew as "Lean Lick." The defendant also made an in-court identification of the defendant as the man who had stabbed him in his side.

Reiterating the arguments that he advanced at trial, the defendant argues that "[t]he . . . court should have suppressed Mongero's out-of-court and in-court identifications because his out-of-court identification was made under highly suggestive circumstances and was unreliable." The defendant argues that the court, in concluding that his due process rights had not been infringed, improperly determined that the out-of-court identification of him by Mongero was not the product of state action. According to the defendant, although the police did not show the newspaper article to the defendant, "they never bothered to conduct an identification procedure that included the defendant or his photo once he was in custody, which was at least five months before the article was published." The defendant argues that "[t]he failure of the police to take the earliest opportunity for Mongero to identify the defendant once they had him in custody was inconsistent with the dictates of *Dickson*, and its inaction constitutes state action." The defendant also argues that the admission of the in-court identification violated his due process rights because it was a first-time identification and the court failed to prescreen the identification to ensure that Mongero reliably could identify him. Finally, the defendant challenges the determination, made by the court in denying the motion

to suppress, that the identification evidence was reliable. Related to this challenge, the defendant also argues, on evidentiary grounds, that the court, in its gatekeeping role, should have precluded the identifications on evidentiary grounds because they were unreliable and misleading in nature. The defendant preserved every aspect of the present claim by means of the arguments advanced by defense counsel in support of the motion to suppress.

"[T]he standard of review for a motion to suppress is well settled. A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . [W]hen a question of fact is essential to the outcome of a particular legal determination that implicates a defendant's constitutional rights, [however] . . . our customary deference to the trial court's factual findings is tempered by a scrupulous examination of the record to ascertain that the trial court's factual findings are supported by substantial evidence. . . . [When] the legal conclusions of the court are challenged, [our review is plenary, and] we must determine whether they are legally and logically correct and whether they find support in the facts [found by the trial court] . . . ." (Internal quotation marks omitted.) *State* v. *Johnson*, 354 Conn. 96, 111–12, 349 A.3d 260 (2026).

A

First, we address the defendant's claim that the court improperly denied his motion to suppress Mongero's out-of-court identification of him because it violated his right to due process. As stated previously in this opinion, the court rejected this claim on the ground that the defendant could not demonstrate a due process violation in light of the fact that the out-of-court identification occurred when DeSantis, who is undisputably a private actor, sent Mongero the newspaper article that included photographs of the defendant, Hedley, and Trejo. The defendant does not challenge the court's findings of fact concerning the out-of-court identification. Instead, the defendant argues that state action occurred in connection

with the out-of-court identification because the police did not attempt to have Mongero identify him after he was in police custody and before the newspaper article was published.

Our Supreme Court has observed that, "[b]ecause the [fourteenth] [a]mendment is directed at the states, it can be violated only by conduct that may be fairly characterized as state action. . . . [T]he [f]ourteenth [a]mendment, which prohibits the states from denying federal constitutional rights and which guarantees due process, applies to acts of the states, not to acts of private persons or entities. . . . The most outrageous behavior by a private party seeking to secure evidence against a defendant does not make that evidence inadmissible under the [d]ue [p]rocess [c]lause." (Citations omitted; internal quotation marks omitted.) *State* v. *Holliman*, 214 Conn. 38, 43, 570 A.2d 680 (1990).

The court found that the out-of-court identification was not the product of state action, and our scrupulous examination of the record supports that finding. Even if the defendant is correct that the police had an opportunity to attempt to obtain an identification prior to the time that DeSantis shared the newspaper article with Mongero, such *inaction* by the state did not taint the identification that occurred by means of a private actor. "[I]t is well established that conduct that may fairly be characterized as state action is a necessary predicate to a challenge under the due process clause of the fourteenth amendment to the United States constitution." Id., 45.

In *Dickson*, our Supreme Court held that due process requires the trial court to prescreen first-time in-court identifications in cases in which identity is at issue. *State* v. *Dickson*, supra, 322 Conn. 426. We discuss *Dickson* in greater detail in part III B of this opinion when we address the defendant's claim that the trial court improperly denied his motion to suppress Mongero's in-court identification of him. In *Dickson*, our Supreme Court stated that "the best practice is to conduct a nonsuggestive identification procedure as soon after the crime

as is possible. . . . It is our hope and expectation that this decision will provide an incentive for the state to conduct an out-of-court identification procedure before seeing an in-court identification, thereby obviating the need to resort to the [prescreening] procedures that we delineate herein." (Citation omitted.) Id., 445. The court also stated, "We simply can perceive no reason why the state cannot attempt to obtain an identification using a lineup or photographic array before asking an eyewitness to identify the defendant in court. Although the state is not constitutionally required to do so, it would be absurd to conclude that the state can simply decline to conduct a nonsuggestive procedure and then claim that its own conduct rendered a first time in-court identification *necessary*, thereby curing it of any constitutional infirmity." (Emphasis in original.) Id., 436.

In his attempt to demonstrate that a due process violation occurred in the present case, the defendant, relying on the foregoing language from *Dickson*, argues that state action occurred in connection with the out-of-court identification in that there was "deliberate" inaction by the police in that they did not ask Mongero to identify him at the earliest opportunity by means of a nonsuggestive identification procedure. The defendant argues that, once he was in the custody of the Commissioner of Correction, the police could have administered a photographic array to Mongero or have arranged for a line up identification with the defendant and other males who resembled him. He argues that "[t]he failure of the police to take the earliest opportunity for Mongero to identify the defendant once they had him in custody was inconsistent with the dictates of *Dickson*, and its inaction constitutes state action."

The evidence at the suppression hearing on which the court relied undermines the defendant's argument that the type of deliberate inaction discussed by the court in *Dickson* occurred in this case. Williams testified at the suppression hearing that, in January 2021, after Mongero was released from incarceration, in advance

of the trial, and at the behest of the state's attorney, he spoke to Mongero by phone for the purpose of having him view a photographic array to identify the defendant. At that time, Mongero informed him that he already had reviewed the newspaper article that contained the defendant's photograph and that he recognized the defendant. Williams testified with respect to his reasons for not conducting an identification procedure while Mongero and the defendant were incarcerated at the same correctional facility, as well as his reasons for not administering an array after Mongero informed him that he had positively identified the defendant by means of the newspaper article. In March 2021, Williams met with Mongero to obtain a written statement that memorialized the out-of-court identification that had occurred when DeSantis shared the newspaper article with Mongero. The court found that the police "ended all further identification procedures based upon what they felt would have been a duplicative use of the picture that had already been published in the newspaper, as that was the only photograph in police possession of the defendant." On the basis of the evidence presented at the suppression hearing, the court found that there had been no "inappropriate conduct" by a state actor with respect to the identification issue before it. On this record, the defendant has not undermined that finding. The defendant has not demonstrated that the present case involves a scenario in which the state had deliberately refused to conduct a pretrial investigation in favor of having an eyewitness confront an accused for the first time in court. Thus, we are not persuaded that the steps taken by the state in the present case, which have not been shown to be unreasonable under the circumstances, were tantamount to the type of deliberate inaction that *Dickson* forbids.[12]

---

[12]We are not suggesting, however, that evidence that the police did not obtain an out-of-court identification at the earliest possible time is not relevant in an analysis of the reliability of Mongero's identifications of the defendant. In *Dickson*, our Supreme Court recognized that "[t]he possibility of [a] defendant's appearance changing over time is one of many reasons that the state should conduct an identification procedure

## B

Next, we address the defendant's claim that the court improperly denied his motion to suppress Mongero's in-court identification because it violated his right to due process. The defendant argues that the in-court identification was a "first-time identification" that was not preceded by a successful identification in a nonsuggestive identification procedure. As stated previously, the defendant claims that state action occurred in connection with the out-of-court identification in that there was "deliberate" inaction by the police in that they did not ask Mongero to identify him at the earliest opportunity by means of a nonsuggestive identification procedure. The defendant argues that, pursuant to the procedure set forth by our Supreme Court in *State* v. *Dickson*, supra, 322 Conn. 410, the court was obligated to first consider whether Mongero could reliably identify him prior to the first-time in-court identification, but that it failed to do so.

In *State* v. *Dickson*, supra, 322 Conn. 410, in which our Supreme Court held that, in cases in which identity is an issue, "first time in-court identifications, like in-court identifications that are tainted by an unduly suggestive out-of-court identification, implicate due process protections and must be prescreened by the trial court." Id., 426. It is important to observe that, in *Dickson*, our Supreme Court distinguished between eyewitness

at the earliest possible time when identity is at issue in a case." *State* v. *Dickson*, supra, 322 Conn. 438 n.21.

We do not agree with the defendant that state action occurred in connection with the out-of-court identification. In part III B of this opinion, we conclude that the prescreening procedures required by *Dickson* do not apply to the in-court identification that occurred at trial. Nonetheless, as we discuss more fully in part III C of this opinion, we recognize that an out-of-court identification that was not obtained at the earliest possible moment by the police is one of many factors that may be relevant to assessing the reliability of an identification obtained at a later time. See id., 421 (assessment of reliability of identification includes consideration of time between crime and identification); see also *Neil* v. *Biggers*, 409 U.S. 188, 201, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972) (factors to be considered in evaluating likelihood of misidentification include length of time between crime and identification procedure).

identifications that involved private actors versus those that involved state actors. The court explained that, "[i]n the absence of unduly suggestive procedures conducted by state actors, the potential unreliability of eyewitness identification testimony ordinarily goes to the weight of the evidence, not its admissibility, and is a question for the jury. . . . Principles of due process require exclusion of unreliable identification evidence that is not the result of an unnecessarily suggestive procedure [o]nly when [the] evidence is so extremely unfair that its admission violates fundamental conceptions of justice . . . .

"A different standard applies when the defendant [as in this case] contends that an in-court identification followed an unduly suggestive pretrial investigation procedure that was conducted by a state actor. In such cases, both the initial identification and the in-court identification may be excluded if the improper procedure created a substantial likelihood of misidentification. . . .

"In determining whether identification procedures violate a defendant's due process rights, the required inquiry is made on an ad hoc basis and is two-pronged: first, it must be determined whether the identification procedure was unnecessarily suggestive; and second, if it is found to have been so, it must be determined whether the identification was nevertheless reliable based on examination of the totality of the circumstances. . . .

"If the trial court determines that there was no unduly suggestive identification procedure, that is the end of the analysis, and the identification evidence is admissible. . . .

"If the court finds that there was an unduly suggestive procedure, the court goes on to address the second reliability prong, under which the corruptive effect of the suggestive procedure is weighed against certain factors, such as the opportunity of the [eyewitness] to view the criminal at the time of the crime, the [eyewitness'] degree of attention, the accuracy of [the eyewitness'] prior description of the criminal, the level of certainty demonstrated at the [identification] and the time between

the crime and the [identification]." **(**Citations omitted; internal quotation marks omitted.**)** Id., 419–21.

We are not persuaded by the defendant's arguments for several reasons. First, the narrow issue before the court in *Dickson* was whether *first-time in-court identifications* are inherently suggestive and, thus, such identifications should be subject to prescreening by the court, just like other identifications that are the result of unduly suggestive identification procedures. Id., 423. The court in *Dickson* concluded that *first-time in-court identifications*, like in-court identifications that are tainted by an unduly suggestive out-of-court identification, implicate a defendant's due process rights and must be prescreened by the trial court. Id., 426. With respect to the procedure to be followed in such cases, the court stated: "[I]n cases in which the identity of the perpetrator is at issue and there are eyewitnesses to the crime, the best practice is to conduct a nonsuggestive identification procedure as soon after the crime as is possible. . . . It is our hope and expectation that this decision will provide an incentive for the state to conduct an out-of-court identification procedure before seeking an in-court identification, thereby obviating the need to resort to the procedures that we delineate herein.

"In cases in which there has been no pretrial identification, however, and the state intends to present a first time in-court identification, the state must first request permission to do so from the trial court. . . . The trial court may grant such permission only if it determines that there is no factual dispute as to the identity of the perpetrator, or the ability of the particular eyewitness to identify the defendant is not at issue. . . . For example, in cases in which the trial court determines that the only issue in dispute is whether the acts that the defendant admittedly performed constituted a crime, the court should permit a first time in-court identification. In cases in which the defendant concedes that identity or the ability of a particular witness to identify the defendant as the perpetrator is not in dispute, the state may

satisfy the prescreening requirement by giving written or oral notice to that effect on the record.

"If the trial court determines that the state will not be allowed to conduct a first time identification in court, the state may request permission to conduct a nonsuggestive identification procedure, namely, at the state's option, an out-of-court lineup or photographic array, and the trial court ordinarily should grant the state's request. If the witness previously has been unable to identify the defendant in a nonsuggestive identification procedure, however, the court should not allow a second nonsuggestive identification procedure unless the state can provide a good reason why a second bite at the apple is warranted. If the eyewitness is able to identify the defendant in a nonsuggestive out-of-court procedure, the state may then ask the eyewitness to identify the defendant in court.

"If the trial court denies a request for a nonsuggestive procedure, the state declines to conduct one, or the eyewitness is unable to identify the defendant in such a procedure, a one-on-one in-court identification should not be allowed. The prosecutor may still examine the witness, however, about his or her observations of the perpetrator at the time of the crime, but the prosecutor should avoid asking the witness if the defendant resembles the perpetrator." (Citations omitted; footnotes omitted.) Id., 445–47.

Contrary to the defendant's characterization of Mongero's in-court identification, it was not a first-time identification. It is not in dispute that Mongero identified the defendant as the perpetrator at the time that DeSantis shared the newspaper article with him. Nor is it in dispute that, prior to the time of trial, Mongero told Williams that the article correctly had identified the three perpetrators whose photographs appeared therein.

Second, although the in-court identification that was elicited by the prosecutor involved state action; see id., 426 (prosecutor's conduct in court can amount to state

action implicating due process rights); the out-of-court identification did not involve state action. The court in *Dickson* stated that, "[i]n the absence of unduly suggestive procedures conducted by state actors, the potential unreliability of eyewitness identification testimony ordinarily goes to the weight of the evidence, not its admissibility, and is a question for the jury." Id., 419.

Finally, although the prescreening requirement set forth in *Dickson* did not apply in this case, in which there was an absence of an unduly suggestive procedure conducted by a state actor, the court nonetheless prescreened the in-court identification as though it *had* been preceded by an unduly suggestive procedure conducted by a state actor. As we noted previously in this opinion, the court in *Dickson* explained that, "[i]n the absence of unduly suggestive procedures conducted by state actors, the potential unreliability of eyewitness identification testimony ordinarily goes to the weight of the evidence, not its admissibility, and is a question for the jury." Id. The court in *Dickson*, however, noted that "[a] different standard applies when the defendant contends that an in-court identification followed an unduly suggestive pretrial identification procedure that was conducted by a state actor. In such cases, both the initial identification and the in-court identification may be excluded if the improper procedure created a substantial likelihood of misidentification." Id., 420.

The court in the present case found, and the state does not dispute, that the out-of-court identification procedure that occurred in this case was unnecessarily suggestive. The court then considered, in light of the totality of the circumstances, whether the out-of-court identification was reliable, correctly focusing on "whether or not the suggestive procedure [that occurred in the present case] would give rise to a substantial likelihood of irreputable misidentification." After the court concluded that the out-of-court identification was reliable, it stated that its determination "necessarily . . .

allow[ed] for the in-court identification procedure to take place, as well."[13]

In light of the foregoing, the defendant is unable to demonstrate that his due process rights were violated in connection with the in-court identification because the court was obligated to follow the prescreening procedure set forth in *Dickson* but failed to do so.

C

The defendant also claims that the court erred in concluding that the identification evidence was reliable. We are not persuaded.

As stated previously in this opinion, in arguing that the identification evidence should be suppressed, the defendant argued before the trial court and argues presently that the out-of-court identification was made under unnecessarily suggestive circumstances that gave rise to a substantial likelihood of misidentification. In its decision denying the motion to suppress, the court concluded that the out-of-court identification, having been made in connection with an unnecessarily suggestive identification procedure, was reliable and, consequently, that the in-court identification was reliable.

The defendant argues that, if this court concludes that there was no improper state action in connection with the identifications made by Mongero, we should nonetheless conclude, in light of criteria applicable to due process claims, that the trial court erred in determining that they were reliable.[14] The defendant argues

---

[13]In part III C of this opinion, we will address separately the defendant's claim that the court improperly determined that the identification evidence was reliable.

[14]We note that the defendant also argues that, even if the identifications did not implicate his right to due process, the court, in its gatekeeping role, should have suppressed the identifications because they amounted to unreliable and misleading evidence "as a matter of evidentiary law." We recognize that evidence that is unreliable or tends to mislead the jury may be deemed inadmissible on purely evidentiary grounds. See Conn. Code Evid. § 4-3 ("[r]elevant evidence may be excluded if its probative value is outweighed by the danger of . . . misleading the jury");

that, pursuant to *State* v. *Holliman*, supra, 214 Conn. 38, the out-of-court identification stemming from the conduct of private actors was not reliable and that it tainted the in-court identification. In *Holliman*, our Supreme Court stated that "the criteria established for determining the admissibility of identifications in the due process context are appropriate guidelines by which to determine the admissibility of identifications that result from procedures conducted by civilians. . . . [F]irst, it must be determined whether the identification procedure was unnecessarily suggestive, and second, if it is found to be so, it must be determined whether the identification was nevertheless reliable based on an examination of the totality of the circumstances." (Footnote omitted; internal quotation marks omitted.) Id., 46.

In *State* v. *Guilbert*, supra, 306 Conn. 218, our Supreme Court, articulating an evidentiary rule, set forth factors that are relevant in assessing the reliability of eyewitness identifications, stating that "[c]ourts across the country now accept that (1) there is at best a weak correlation between a witness' confidence in his or her identification and its accuracy, (2) the reliability of an identification can be diminished by a witness' focus on a weapon, (3) high stress at the time of observation may render a witness less able to retain an accurate perception and memory of the observed events, (4) cross-racial identifications are considerably less accurate than same race identifications, (5) a person's memory diminishes rapidly over a period of hours rather than days or weeks, (6) identifications are

*State* v. *Michael H.*, 291 Conn. 754, 767, 970 A.2d 113 (2009) (trial court serves "gatekeeping function with regard to unreliable evidence"). We have already concluded that there was no state action involved in the out-of-court identification that was the result of DeSantis acting alone. The trial court, however, properly evaluated the reliability of the identifications in light of the factors that apply when state action is involved. See *State* v. *Holliman*, supra, 214 Conn. 46 (criteria for determining admissibility in due process context are appropriate for determining admissibility of identifications resulting from procedures conducted by civilians). Because we reject the defendant's argument that the court did not properly consider these factors, it follows that he is unable to demonstrate that the court abused its discretion in failing to exclude the evidence on purely evidentiary grounds.

likely to be less reliable in the absence of a double-blind, sequential identification procedure, **(7)** witnesses are prone to develop unwarranted confidence in their identifications if they are privy to postevent or postidentification information about the event or the identification, and **(8)** the accuracy of an eyewitness identification may be undermined by unconscious transference, which occurs when a person seen in one context is confused with a person seen in another. This list is not exhaustive; courts have permitted expert testimony on other factors deemed to affect the accuracy of eyewitness identification testimony." **(Footnotes omitted.)** Id., 237–39. Before the trial court, defense counsel argued that factors three, four, five, and seven supported his argument that the out-of-court identification should be suppressed.

In *State* v. *Harris*, 330 Conn. 91, 191 A.3d 119 (2018), our Supreme Court stated that "[a]n identification that is the product of an unnecessarily suggestive identification procedure will nevertheless be admissible, despite the suggestiveness of the procedure, if the identification is reliable in light of all the relevant circumstances. See, e.g., *State* v. *Marquez*, **[291 Conn. 122, 141, 967 A.2d 56, cert. denied, 558 U.S. 895, 130 S. Ct. 237, 175 L. Ed. 2d 163 (2009)].** As mandated in *Neil* v. *Biggers*, **[409 U.S. 188, 196–97, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972)],** and reiterated by the court in *Manson* v. *Brathwaite*, **[432 U.S. 98, 113–14, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977)],** for federal constitutional purposes, we determine whether an identification resulting from an unnecessarily suggestive procedure is reliable under the totality of the circumstances by comparing the corrupting effect of the suggestive identification against factors including the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the [identification], and the time between the crime and the [identification]." **(Internal quotation marks omitted.)** *State* v. *Harris*, supra, 108. In evaluating the reliability of an identification on due process grounds, courts

have also looked to "the degree of contact or number of confrontations the witness had with the defendant prior to trial." **(**Internal quotation marks omitted.**)** *State* v. *Garner*, 270 Conn. 458, 469, 853 A.2d 478 **(**2004**)**.

In *Harris*, our Supreme Court concluded, as a matter of state constitutional law, that it was appropriate to modify the *Biggers* framework and to endorse the factors for determining the reliability of an identification that it identified as a matter of state evidentiary law in *State* v. *Guilbert*, supra, 306 Conn. 253.[15] *State* v. *Harris*, supra, 330 Conn. 115. The court in *Harris* also stated that "[a reviewing court] will reverse the trial court's ruling [on the admissibility of evidence] only [when] there is an abuse of discretion or [when] an injustice has occurred . . . and we will indulge in every reasonable presumption in favor of the trial court's ruling. . . . Because the inquiry into whether evidence of pretrial

---

[15]Additionally, the court in *Harris* determined the proper framework, for state constitutional purposes, for evaluating the reliability of an identification that is the result of an unnecessarily suggestive identification procedure. The court concluded that, "to obtain a pretrial hearing [on the reliability of an identification that is the result of an unnecessarily suggestive identification procedure as a matter of due process under the state constitution], the defendant has the initial burden of offering some evidence that a system variable undermined the reliability of the eyewitness identification. . . . If the defendant meets this burden, the state must then offer evidence demonstrating that the identification was reliable in light of all relevant system and estimator variables. . . . If the state adduces such evidence, the defendant must then prove a very substantial likelihood of misidentification. . . . If the defendant meets that burden of proof, the identification must be suppressed." (Citations omitted.) *State* v. *Harris*, supra, 330 Conn. 131. The court in *Harris* further explained "that the requirement that the defendant provide some evidence of suggestiveness may necessitate somewhat less evidence to trigger the admissibility inquiry than is required under the *Biggers* framework. . . . [T]his lower threshold is appropriate both because it will provide more meaningful deterrence and because more extensive hearings will address reliability with greater care and better reflect how memory works. . . . In the absence of evidence of a suggestive procedure or other extraordinary circumstances, however, we continue to believe that evidence relating solely to estimator factors that affect the reliability of the identification goes to the weight, not the admissibility, of the identification." (Citations omitted; internal quotation marks omitted.) Id., 132.

identification should be suppressed contemplates a series of [fact bound] determinations, which a trial court is far better equipped than this court to make, we will not disturb the findings of the trial court as to subordinate facts unless the record reveals clear and manifest error. . . . Finally, the burden rests with the defendant to establish both that the identification procedure was unnecessarily suggestive and that the resulting identification was unreliable." (Citation omitted; internal quotation marks omitted.) Id., 102.

As we stated previously in this opinion, the court found, and the state does not dispute, that the out-of-court identification procedure that occurred in this case was unnecessarily suggestive. The court then made numerous findings with respect to the issue of reliability. The court found that "Mongero's opportunity to view his predator [for himself] during the incident . . . [was] substantial. They were in close proximity to each other for a majority of the incident and at one point were in fact face-to-face. The lighting conditions were favorable. There was no obstruction or impediments to the witness' ability to be able to view the defendant.

"Although the circumstances of the event were certainly stressful, testimony was that because the witness had only expected one person to be entering his house, when he saw multiple people, it heightened his sense[s] and he was suspicious and, therefore, was paying closer attention to the circumstances surrounding him.

"The description that the witness gave to the police at the time or in close proximity to the incident itself have remained consistent and are in fact consistent with the description of the defendant himself. The witness' description of the defendant in fact did not change and that stands true even in light of the fact that the witness was asked by the police and participated in multiple other identification procedures where he was shown photo arrays but did not make any identification. So, there is no false identifications or identifications that later turned out not to be accurate.

"In fact, the only identification that [Mongero] did make was when he ultimately saw the picture that was in the newspaper. All of these things add to the fact that, in this court's opinion, the circumstances and the totality of the circumstances in this particular case based upon this witness' identification lead to the conclusion that it is in fact a reliable identification . . . ."

In challenging some of the court's specific subordinate findings, the defendant argues that the evidence did not support the finding that the lighting conditions were favorable because Mongero did not so testify. At the suppression hearing, Mongero testified that the incident occurred on May 23, 2018, and the room where the incident occurred was approximately forty to fifty square feet in size.[16] When asked during the suppression hearing whether he recognized the men shown in the photographs in the newspaper article, Mongero testified that he saw DeSantis' attacker whom "I had the best view on, because he was standing near my window and *where the most light was coming in*." (Emphasis added.) When asked whether he recognized "a second individual," Mongero testified that "for sure" he recognized the person who was "in my face with a knife in my side." Although Mongero did not testify that the lighting conditions were favorable, the evidence reflects that there was light coming into the room from at least one source, a window, and that Mongero did not express any hesitation with respect to his ability to observe and describe the physical appearances of the men in his bedroom. On the basis of this testimony and the rational inferences to be drawn therefrom, the court reasonably could have found that the lighting conditions were favorable.

The defendant also argues that the evidence did not support the court's finding that there was no obstruction or impediment to Mongero's ability to view the defendant at the time of the assault. According to the defendant,

---

[16]At the time of trial, the state presented evidence that the incident occurred in the month of May at approximately 6:30 p.m., which is consistent with Mongero's testimony that sunlight was visible to him through the bedroom window.

this finding is contradicted by Mongero's testimony at the suppression hearing that, when the defendant was in his lap, face-to-face with him, his dreadlocks were blocking his face "a little bit." At the suppression hearing, Mongero also testified that the defendant was not wearing a mask, a hat, or glasses. Mongero testified that the defendant had "[a] distinctive hairstyle" but agreed that he nonetheless got "a good look" at him. The defendant's dreadlocks are an aspect of his physical appearance, and Mongero did not hesitate in recalling and describing the defendant's physical attributes, specifically stating that he recognized the defendant's forehead. Viewing the evidence in its totality and the reasonable inferences that may be drawn from the evidence, Mongero's testimony that, at the time that the defendant was in a physical altercation with him and face-to-face with him, the defendant's dreadlocks blocked his face "a little bit" does not undermine the court's general observation that there was no obstruction or impediment to Mongero's ability to view the defendant.

Finally, the defendant points to a variety of considerations that he believes were ignored by the court and rendered the out-of-court identification unreliable. First, according to the defendant, the physical description that Mongero provided to the police at the time of the altercation was vague. Mongero told the police that the perpetrator had dreadlocks, and the defendant's photograph in the newspaper did not show him with dreadlocks. Second, the fact that Mongero did not inaccurately identify him prior to the identification did not weigh in favor of the finding of reliability because the police did not conduct a nonsuggestive identification procedure with respect to him. Third, in 2018, the police showed Mongero a photographic array that included Hedley, but Mongero was unable to positively identify him. Fourth, two years had passed before Mongero viewed the newspaper article, and the defendant's photograph appeared in that article with a photograph of Trejo, someone who was known to Mongero. Fifth, during the altercation, Mongero was grappling with the perpetrator to control

the knife and "he was likely focused on the knife and not on his attacker's face, which reduces reliability." Sixth, "[h]igh stress situations such as these, as well as the passage of time, make a witness less able to retain an accurate perception and memory of the observed events." (Internal quotation marks omitted.) Seventh, "the court utterly failed to factor in that Mongero was told that the defendant had been arrested and his DNA was found on one of the weapons, and that [Williams] confirmed this was in the bag, which would have affected the confidence he had in his identification." (Internal quotation marks omitted.) The defendant argues that these considerations outweigh the factors on which the court relied.

The defendant's arguments are not persuasive. Mongero's physical description of the man who stabbed him in his side was not vague. At the suppression hearing, Williams testified that, in the immediate aftermath of the altercation, Mongero told the police that the perpetrator that he later identified as the defendant was "a black male with long dreads and yellow tips." Mongero also said the perpetrator was of average build, that he was approximately five feet, ten inches in height, and in "his mid-twenties . . . ." Moreover, Mongero told the police that the perpetrator was wearing a camouflage sweatshirt and jeans. Further, it does not logically follow that, if the defendant's photograph in the newspaper article did not depict him as having dreadlocks, Mongero could not reliably recognize him in the photograph.

Also, we are not persuaded that the court erred by considering the fact that at no time did Mongero misidentify the defendant in a nonsuggestive identification procedure. While this factor is not dispositive of the issue of reliability, it nonetheless was relevant to the court's analysis. Additionally, the fact that Mongero was unable to identify Hedley when the police showed him Hedley's photograph in a nonsuggestive identification procedure does not undermine the reliability of his identification of the defendant, with whom Mongero had a longer face-to-face interaction when the defendant got on top of him and stabbed him in his side.

The defendant correctly observes that **(1)** two years had passed before Mongero viewed the newspaper article; **(2)** the defendant's photograph appeared in that article with a photograph of Trejo, someone who was known to Mongero; **(3)** during the altercation, Mongero was grappling with the perpetrator to control the knife; **(4)** Mongero observed the defendant during a high stress situation during which he sustained serious physical injuries; and **(5)** Mongero viewed the defendant's photograph in a newspaper article that contained information about the defendant's arrest and, thereafter, learned from Williams that DNA evidence supported the defendant's arrest. We agree with the defendant that these factors are part of the totality of the circumstances that are relevant to an analysis of the issue of reliability in this case. We do not, however, agree with the defendant that the court did not take any or all of these factors into consideration in its evaluation of the reliability of the identification. The court heard lengthy argument concerning the reliability of the identification evidence in this case. The fact that the court did not explicitly discuss these factors in its ruling does not lead us to conclude that the court overlooked them; it merely reflects that the court focused on the factors that supported its finding that the evidence was reliable. Moreover, we are not persuaded that, just because there were one or more relevant factors that did not support the finding of reliability, the court was legally required to find that the identification was not reliable. See, e.g., *State* v. *Scott*, supra, 191 Conn. App. 338–39 (court is not required to afford more weight to factors tending generally to undermine reliability); *State* v. *Day*, 171 Conn. App. 784, 822, 158 A.3d 323 (2017) (same), cert. denied, 330 Conn. 924, 194 A.3d 776 (2018). The court carefully set forth its findings with respect to the factors upon which it relied, all of which were supported by the evidence and by law. An evaluation of reliability is based on all of the relevant circumstances, and no single factor is dispositive. Having reviewed the court's findings and all of the relevant circumstances, we

are not persuaded that the court erroneously determined that the out-of-court identification was reliable.

Finally, in light of our conclusion that the court did not err in determining that the out-of-court identification was reliable, the defendant is unable to demonstrate that the court improperly concluded that the in-court identification was not reliable because it was the product of—or was tainted by—the unnecessarily suggestive out-of-court identification procedure that occurred in this case. In concluding that Mongero's out-of-court identification of the defendant was reliable, we necessarily have rejected the defendant's contention that the procedure that produced it created a substantial likelihood of misidentification. It follows, therefore, that that identification "cannot be deemed to have so tainted the reliability of [the witness'] in-court identification as to preclude the state from using it." *State* v. *Scott*, supra, 191 Conn. App. 341. For the foregoing reasons, we conclude that the trial court did not err in concluding that the identification evidence was reliable.

IV

Finally, the defendant claims that the court erred in denying his motion for a new trial based on material evidence that the prosecution suppressed in violation of *Brady* v. *Maryland*, supra, 373 U.S. 83. We are not persuaded.

The following additional procedural history is relevant to this claim. On December 8, 2021, the jury returned its verdict in this case. The sentencing hearing did not occur until April 19, 2023. On February 14, 2022, the defendant filed a motion for a new trial pursuant to Practice Book § 42-53.[17] The defendant alleged the following

[17]Practice Book § 42-53 provides in relevant part: "(a) Upon motion of the defendant, the judicial authority may grant a new trial if it is required in the interests of justice. Unless the defendant's noncompliance with these rules or with other requirements of law bars his or her asserting the error, the judicial authority shall grant the motion: (1) For an error by reason of which the defendant is constitutionally entitled to

relevant facts. On September 7, 2021, the defense filed a written motion in which it sought from the state, inter alia, copies of all disciplinary records for Williams. On October 12, 2021, the state responded to the request by providing the defendant with a letter dated October 8, 2021, signed by the Danbury police chief, Patrick Ridenhour, which stated that Williams' file did not contain past or pending substantial complaints or discipline related to misconduct, bias, or untruthfulness. Following the verdict, however, defense counsel learned that, in early 2021, Williams falsified recertification training attendance records and time sheets related to that training. This was conduct that subjected him to criminal liability for making a false statement. Following an internal affairs investigation, Williams was suspended without pay on September 27, 28 and 29, 2021. The defendant argued that, if these facts about Williams' disciplinary record were accurate, "said deprivation of said information was materially injurious to the defendant and he is constitutionally entitled to a new trial." Thereafter, the court granted the defendant permission to subpoena certain disciplinary records of Williams.

On October 24, 2022, the defendant filed an amended memorandum of law in support of his motion for a new trial. Therein, the defendant described the allegedly suppressed information, some or all of which he obtained by means of a request under the Freedom of Information Act, General Statutes § 1-200 et seq., as follows: "To remain certified as a police officer, the state of Connecticut requires police officers to complete sixty hours of training every three years. Until COVID, that training was taken in classroom settings, which required attendance for the total number of training hours, after which officers were required to submit Review Training Credit (RTC) forms under oath (subject to violation of General Statutes § 53a-157b (class A misdemeanor false statement in the second degree)), indicating the training subject and hours attended. Detective Williams had been

a new trial; or (2) For any other error which the defendant can establish was materially injurious to him or her. . . ."

a police officer since 2004, thus attending approximately 300 hours of this training before 2020. In 2021, due to COVID, the state of Connecticut allowed police officers to attend recertification classes online instead of classroom training. All Danbury police officers were advised beforehand that they would only be able to print RTC forms for signing after they had remained in attendance for the hours the online course awarded.

"On February 16, 17 and 18, 2021, Williams utilized the online training platform and submitted RTC forms, signed under oath, that he had completed twenty-one hours of required training. Subsequently, an internal audit revealed that Williams had actually attended only two and one-half hours of training, despite signing RTC forms under oath that he had completed twenty-one hours of training. Williams accomplished this by opening multiple computer windows and logging into multiple training classes simultaneously, leaving each window open until the required time had passed, then printing the RTC forms awarded and signing each under oath. In total, Williams submitted twelve RTC forms signed under oath during the three days, exposing him to twelve years of incarceration were they determined [to have been] sworn to falsely. Danbury Police Chief Ridenhour ordered an internal affairs investigation of Williams' conduct to determine whether Williams had violated Connecticut General Statutes and/or departmental policies. The internal affairs investigation concluded Williams was guilty only of 'failure to perform assigned administrative duties.' Williams was suspended by Chief Ridenhour without pay between September 27, 28 and 29, 2021, and was required to retake the twenty-one hours of training.

"On October 8, 2021 (less than ten days after Williams served his suspension), Chief Ridenhour provided the state with a letter indicating [that] a review of Williams' file showed that he had 'no substantiated complaints or discipline related to misconduct, bias or untruthfulness.' This letter was provided to the defendant shortly before trial in response to the defendant's discovery request of

Williams' disciplinary records." (Footnotes omitted.) The defendant also stated that, "[i]n early 2022, after the guilty [verdict], Williams' union filed a grievance, and, in early 2022, Chief Ridenhour agreed to the reversal of his suspension."

In support of his motion for a new trial and his *Brady* claim, the defendant focuses on the following inconsistencies between the trial testimony of Williams and Mongero, which are reflected in the record. Mongero testified that, upon his arrival at the hospital immediately after the incident at his residence, he told the police who were questioning him "to f-off and leave me alone because I was very injured and I didn't want to hear their mouth. I didn't want . . . to talk to anyone especially the police. I did not even know what to say to them." Mongero testified, however, that, while he was in the operating room at the hospital, he provided the police with a physical description of the perpetrators. Mongero testified that, ultimately, the doctors told the police to leave and that they could speak to him when he "gets out."

Mongero testified that, after he was discharged from the hospital the next day, he immediately went to the police department because one of the officers had told him that if he cooperated with them, he would not have to "worry about" charges related to the illegal drugs that the police found in his residence. Mongero agreed that, "on a very minimalistic level," the police conveyed that, if he helped them, they would help him. Mongero also testified that "[the police] couldn't get . . . any sort of information from me [at the hospital on the prior day because] I didn't even know they were detectives. So, they wanted me to talk, come talk to them." Mongero further explained that, initially, he was hesitant to help the police, stating, "I was afraid of what charges they might bring against me for what pills were found."

Defense counsel thoroughly cross-examined Mongero with respect to his reasons for cooperating with the police. Although he expressed his concern about being prosecuted for the drugs found in his residence,

he nonetheless maintained that this was not his primary concern when he went to the police department. Mongero testified: "I was more concerned because my covictim was stabbed and had to have heart surgery and almost died. Much more so than me, [DeSantis] was very hurt, and I was more concerned—and he wasn't living the lifestyle like I was. He didn't—he kind of got caught in the mix of something he didn't sign up for. So, that's the main reason I decided to cooperate."

Mongero also testified that, after he saw the newspaper article that DeSantis sent to him, the police called him and asked him "if it was true that [he] had seen the picture . . . ." Mongero testified that the police had learned that DeSantis had showed him the article and wanted to know if what he said to DeSantis about the article was true, that he recognized the men pictured therein. Defense counsel asked Mongero if his identification of the perpetrators was motivated by a desire to avoid the penalties that would result from his possession of illegal drugs, to which Mongero replied that he was "just trying to tell the truth."

In contrast to Mongero's testimony as to these specific issues, Williams testified that neither he nor the other detectives in his squad asked Mongero to come to the police department, but that he walked into the police department after he was discharged from the hospital "on his own accord." Williams also testified that, when he called Mongero to invite him to view a photographic array, Mongero informed him that "he already saw a picture of [the defendant]" that he had received from DeSantis.

In support of his motion for a new trial, the defendant argued in relevant part that "Mongero's testimony, if believed, established the existence of a quid pro quo offered by Williams to Mongero at the outset of the investigation that, if Mongero helped the police, Mongero would not be arrested for drug dealing and that Mongero's initial identification of the defendant was precipitated solicitously. Williams' testimony contradicted

Mongero's testimony and was likely believed over Mongero's testimony. Had Mongero's testimony been credited by the jury, Mongero's bias would have been exposed, and the reliability of his identifications of the defendant significantly eroded. Without the suppressed exculpatory information, the defendant could not impeach Williams' testimony regarding these two crucial aspects. Therefore, given [that] Williams' credibility was central to the state's case, the suppression of the exculpatory information was material to the outcome of the case." (Footnote omitted.)

The defendant argued that "Mongero testified that he was assured at the hospital . . . that if he cooperated with the police, he would not be arrested for illegal drugs and was directed at the hospital to visit Williams upon his release. Contrarily, Williams never testified to any such quid pro quo inducement, maintaining that neither he nor any other police officer instructed Mongero to come to the police department upon discharge from the hospital—that Mongero went to the police department purely on his own accord.

"Further, and again, Mongero testified that Williams called him in March 2020 and asked him if what Williams had heard from DeSantis was true: that DeSantis called Mongero and told him that 'they caught the guys' and sent Mongero the news article and Mongero agreed that the defendant was his attacker. Mongero testified he replied that it was all true. Contrarily, Williams testified to a nonsolicitous account of the conversation: that he simply asked Mongero if Mongero would be able to identify the defendant in a photo lineup and that it was Mongero who sua sponte responded that he would, but that he had already seen a picture of the defendant in the news article and he was certain the defendant was his initial attacker.

"Williams' testimony contradicting Mongero's claim of the existence of a quid pro quo at the outset of the investigation and Mongero's account of the solicitous nature of Williams' telephone call to Mongero that precipitated

Mongero's initial identification of the defendant was likely accepted by the jury over Mongero's testimony."

In his memorandum of law in support of his motion for a new trial, the defendant based his argument that Mongero's testimony was central to the state's case on evidence that the defendant did not show signs of injury following the incident involving Mongero, despite the fact that Mongero testified that he had stabbed his assailant. Also, there was forensic evidence that DNA from an unknown source was found on the knife that contained the defendant's DNA. The defendant also argued that there were multiple reasons for the jury to doubt the veracity of Mongero's testimony, including the undisputed evidence that he had a criminal history and had entered into a cooperation agreement with the state.

On November 29, 2022, the state filed a written objection to the motion for a new trial on the ground that "the information relating to [Williams'] disciplinary record was not favorable evidence because it did not pertain to veracity and the deprivation of said information was not material." In its memorandum of law in support of its objection to the motion for a new trial, the state represented that, in preparation for trial and pursuant to *Giglio* v. *United States*, 405 U.S. 150, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972), it requested that the Danbury Police Department provide it with any impeachment evidence that should be disclosed to the defense.[18] The state represented that, although the Danbury Police Department concluded that Williams had engaged in improper conduct in connection with the recertification training at issue and required him to retake several classes, it concluded that the information about the recertification issue did not pertain to misconduct or bias. For this reason, the police department did not disclose the information at issue to the state. The state argued that the information at issue was not favorable

---

[18]*Giglio* provides that, "[w]hen the reliability of a given witness may well be determinative of guilt or innocence, nondisclosure of evidence affecting credibility falls within [the] general rule [of disclosure under *Brady*]." (Internal quotation marks omitted.) *Giglio* v. *United States*, supra, 405 U.S. 154.

to the defendant because it did not pertain to Williams' veracity.[19] The state also argued that, even if the evidence at issue was favorable to the defense, it was not material because, "[c]onsidering the nature of the nondisclosed records and Williams' role in the stabbing investigation, the records could not reasonably be taken to put the whole case in such a different light as to undermine the confidence of the verdict."

On December 19, 2022, the court held a remote hearing on the motion for a new trial. On March 23, 2023, the court issued a memorandum of decision in which it denied the motion for a new trial. The court set forth the factual basis for the motion, summarized the parties' arguments, and discussed the legal principles governing motions for a new trial based upon *Brady* violations. The court then stated: "The initial question . . . becomes whether the information relating to [Williams'] submission, under oath, of documents which suggested that he was untruthful in his training obligations and his subsequent disciplinary action were discoverable as of right. There is little debate, in this court's opinion, that the defendant was entitled to this information. Williams' personnel file substantiated that he had, under oath, [sworn] to his participation and completion of mandatory online training. The fact that Williams later passed the required tests, or that the chief of police opined that his conduct was not 'material' is of no significance. His conduct directly implicated issues of trustworthiness, and the defendant was entitled to know this information so he could challenge the truthfulness of Wiliams' testimony before the jury. . . .

"Having concluded that the evidence was suppressed and potentially favorable to the defense, the remaining

[19]The state represented that, "[i]n a letter supplied to the state after the filing of the defendant's motion, the [Danbury police] chief articulated that, because the conduct in question did not involve the falsification of time or attendance records and because Williams was truthful throughout the administrative inquiry, it was determined that it did not need to be disclosed to the state pursuant to the state's . . . request [for disclosure pursuant to *Giglio* v. *United States*, supra, 405 U.S. 150]."

inquiry is whether it was material to guilt or punishment. The test for materiality of a *Brady* violation requires that there be a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. . . . In analyzing a *Brady* claim, the court must avoid concentrating on the suppressed evidence in isolation but [such evidence] must be weighed and measured in the context of the entire record. . . .

"The defendant argues that [Williams'] testimony contradicted Mongero as to whether an agreement had been reached that Mongero would not be arrested on narcotics charges if he cooperated with the police. The defendant ponders that, if Mongero's testimony had been credited by the jury, corroborating that a deal had in fact been reached, his identification of the defendant as the perpetrator of the offense might hold less weight. Ultimately, the defendant argues that the impeachment evidence would have discredited Williams and, in so doing, allow the jury to believe Mongero's biases, which would, in turn, call into question his testimony against the defendant. The defendant, however, cross-examined both witnesses extensively, particularly regarding Mongero's lack of arrest for narcotics. The defense speculates that the jury must have believed Williams over Mongero, but that assertion is certainly not fact based as the jury is free to believe all, some, or none of any witness' testimony. The jury is tasked with the responsibility of resolving conflicts in witness' testimony and determinations of credibility. The jury was privy to the cooperation agreement between Mongero and the state, and Mongero was [extensively] cross-examined on his motives and biases in offering testimony.

"Although the defendant asserts that Williams' testimony was fatally essential to the state's case, this is not borne out by the evidence presented to the jury. The jury heard evidence that the defendant fit the description of a suspicious individual observed by a neighbor at the crime scene, that the defendant's DNA was on

the weapon recovered at the scene, which also had Mongero's DNA; the defendant's cell phone was placed in close proximity to the crime scene at the time of the incident; the defendant's cell phone was later placed in close proximity to his home address in New York, and the defendant was identified on multiple occasions by Mongero. Williams was not an integral part of evidence recovery at the scene, [performing] the DNA analysis, or acquiring the cell tower information on the defendant's phone. Ultimately, there was an abundance of evidence [on] which the jury could base its verdict. To suggest that Williams' credibility would have been so impaired by the suppressed material such as to undermine the integrity of the jury's verdict is a gross simplification of the evidence against the defendant. Particularly, where the defendant extensively cross-examined Mongero on the very issue he asserts would have been impacted, his motivation in providing testimony for the state. The fact that [the testimony of the witness who might have been impeached] is corroborated by additional inculpatory evidence at trial plays a weighty role in assessing the materiality of the suppression. . . .

"Furthermore, and quite notably, in this particular instance the defendant is not arguing that evidence of an agreement was suppressed in violation of *Brady*. Instead, the defendant's argument is based upon impeachment evidence attacking the credibility of a police witness unrelated to the investigation of the trial matter itself. The defendant bases his claim of materiality on what he asserts to be the erosion of credibility transferred from Williams to Mongero, arguing that, if the jury were to disregard Williams' credibility, they would in turn find Mongero's testimony that he was insulated from prosecution more believable. The jury, however, was privy to the state's cooperation agreement with Mongero, who was extensively cross-examined about his motivation in providing testimony. The value of the suppressed evidence is speculative at best and of minimal import when viewed in [light of the] totality [of the evidence presented at trial]. . . .

"The court finds that there is no reasonable probability that the outcome of the defendant's trial would have been different had the police personnel file been disclosed. Nor does the record support a finding that the suppression undermined confidence in the outcome of the trial. As such, the defendant's motion for a new trial is denied." (Citations omitted.) The defendant challenges the court's decision on various grounds that we will address in turn.

"[O]ur standard of review of the trial court's denial of a motion for a new trial is limited to a determination of whether, by such denial, the court abused its discretion. . . . As a reviewing court considering the trial court's decision granting or denying a motion for a new trial, we must be mindful of the trial judge's superior opportunity to assess the proceedings over which he or she has personally presided." (Citations omitted; internal quotation marks omitted.) *State* v. *Roberson*, 62 Conn. App. 422, 425–26, 771 A.2d 224 (2001). The defendant filed the motion for a new trial pursuant to Practice Book § 42-53; see footnote 17 of this opinion; which "rule of practice is limited to trial errors and provides for the granting of a motion for a new trial in the interests of justice for constitutional error or other materially injurious error." *State* v. *Massaro*, 205 Conn. App. 687, 700, 258 A.3d 735 (2021), aff'd, 347 Conn. 200, 296 A.3d 782 (2023).

Because the defendant's motion for a new trial was based on an alleged *Brady* violation, we must evaluate the denial of the motion for a new trial in light of the court's resolution of the *Brady* claim on which it was based. "In *Brady* v. *Maryland*, supra, 373 U.S. 87, the United States Supreme Court held that the suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. . . . [T]he *Brady* rule applies not just to exculpatory evidence, but also to impeachment evidence . . . which, broadly defined, is evidence having the potential to alter the jury's assessment of the credibility of a significant prosecution witness. . .

. In order to prove a *Brady* violation, the defendant must show: **(1)** that the prosecution suppressed evidence after a request by the defense; **(2)** that the suppressed evidence was favorable to the defense; and **(3)** that the evidence was material. . . . Thus, [i]n order to obtain relief under *Brady*, a defendant bears the heavy burden of satisfying all three prongs of the aforementioned test . . . . Whether the [defendant] was deprived of his due process rights due to a *Brady* violation is a question of law, to which we grant plenary review." (Citations omitted; emphasis omitted; internal quotation marks omitted.) *State* v. *Emmanuel C.*, 233 Conn. App. 156, 168–69, 338 A.3d 1177 (2025).

"The *Brady* rule is based on the requirement of due process. Its purpose is not to displace the adversary system as the primary means by which truth is uncovered, but to ensure that a miscarriage of justice does not occur. Thus, the prosecutor is not required to deliver his entire file to defense counsel, but only to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial . . . . In other words, [u]nder the last *Brady* prong, the prejudice that the defendant suffered as a result of the impropriety must have been material to the case, such that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict. . . . If . . . [a defendant] . . . fail[s] to meet his burden as to [any] one of the three prongs of the *Brady* test, then [the court] must conclude that a *Brady* violation has not occurred." (Citation omitted; internal quotation marks omitted.) *Gray* v. *Commissioner of Correction*, 236 Conn. App. 246, 254, 347 A.3d 270 (2025), cert. denied, 354 Conn. 909, 349 A.3d 1093 (2026).

Here, the court determined that the defendant satisfied the first two prongs of the *Brady* test in that the information concerning Williams was suppressed by the state and favorable to the defense. Consistent with the defendant's appellate claim and the state's arguments related thereto, the first two *Brady* prongs are not at

issue in this appeal. Thus, we focus our attention on the court's determination that the defendant failed to satisfy *Brady*'s materiality prong. "[M]ateriality under *Brady* presents a mixed question of law and fact subject to plenary review, with the underlying historical facts subject to review for clear error. . . . The test for materiality is whether the suppressed evidence in the context of the entire record creates a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. . . . [T]he mere possibility that an item of undisclosed evidence might have helped the defense or might have affected the outcome of the trial, however, does not establish materiality in the constitutional sense. . . . The question [of materiality] is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A reasonable probability of a different result is accordingly shown when the government's evidentiary suppression undermines confidence in the outcome of the trial. . . . [W]here there is no reasonable probability that disclosure of the exculpatory evidence would have affected the outcome, there is no constitutional violation under *Brady*. . . .

"A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict. . . . One does not show a *Brady* violation by demonstrating that some of the inculpatory evidence should have been excluded, but by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict. . . . Accordingly, the focus is not whether, based [on] a threshold standard, the result of the trial would have been different if the evidence had been admitted. We instead concentrate on the overall fairness of the trial and whether nondisclosure of the evidence was so unfair as to undermine our confidence in the jury's verdict. . . . Put differently, materiality is

established if the withheld evidence is of sufficient import or significance in relation to the original trial evidence that it reasonably might give rise to a reasonable doubt about the petitioner's guilt." (Citations omitted; internal quotation marks omitted.) Id., 257–58.

The defendant challenges several of the underlying historical facts set forth by the court. "We will not disturb a [trial] court's findings with respect to the underlying historical facts [in connection with a *Brady* claim] . . . unless the findings are clearly erroneous." *Peeler* v. *Commissioner of Correction*, 170 Conn. App. 654, 689, 155 A.3d 772, cert. denied, 325 Conn. 901, 157 A.3d 1146 (2017). "In determining whether a finding is clearly erroneous, it is not the role of this court to weigh the evidence presented or to evaluate the credibility of witnesses. . . . Rather, [a] finding of fact is clearly erroneous when there is no evidence to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . In making this determination, every reasonable presumption must be given in favor of the trial court's ruling." (Citation omitted; emphasis omitted; internal quotation marks omitted.) *State* v. *Dennis*, 237 Conn. App. 649, 658–59, 352 A.3d 204, cert. denied, 354 Conn. 932, A.3d (2026). First, the defendant argues that the court's findings that "the defendant's cell phone was placed in close proximity to the crime scene at the time of the incident" and that "the defendant's cell phone was later placed in close proximity to his home address in New York" are clearly erroneous. According to the defendant, "[t]he state never presented any evidence . . . about his phone at all. Rather, it only produced evidence that Trejo's phone, a phone registered to a Mark Hedley, and an 'e-pay' phone were making calls within a few miles of Mongero's [residence] at the time of the incident. . . . There was no evidence presented that the defendant possessed or used the e-pay phone." (Citation omitted.)

The defendant's argument concerning a cell phone, described as an "e-pay" cell phone at the time of trial,

is not persuasive because the state presented evidence from which the jury reasonably could have inferred that the phone was associated with him.[20] During their investigation, the police searched a cell phone associated with Trejo, which reflected that, at or near the time of the incident at Mongero's residence, Trejo used his cell phone either to send or receive messages from two other cell phones. Through their investigation, the police determined that one of these cell phones, registered with Verizon and using a 917 area code, was associated with Hedley. The other cell phone was an "e-pay" cell phone with a 646 area code. The police later determined through the use of cellular data analysis that the three cell phones were in the area of Mongero's residence at or near the time of the incident on May 23, 2018, and thereafter the e-pay cell phone was in close proximity to the defendant's residence in the Bronx, New York. For the foregoing reasons, the court's finding was supported by the evidence and the rational inferences to be drawn therefrom.

Second, the defendant also argues that the court's finding that "the defendant fit the description of a suspicious individual observed by a neighbor at the crime scene" was clearly erroneous. The evidence reflects that, at or about the time of the incident at Mongero's residence, one of Mongero's neighbors, Maria Tombline, observed three young men walking down her street and took note of their appearances. During her trial testimony, she stated that she "just . . . had that feeling" that their presence was suspicious. She also stated that she observed a Hispanic male wearing a plaid flannel shirt and jeans, another young man who had dreadlocks with yellow tips, and another young man who "had his hood up." When asked to describe the race of the latter two men, she said they were "people of color" but was unable to recall

---

[20]The state presented evidence that there was no available subscriber information for this cell phone. The person or persons using the phone prepaid for services following activation of the phone and, thus, no financial or other type of identification verification was necessary prior to its use.

more details than that. Another of Mongero's neighbors, Andrew Middlebrook, testified at trial that, at or near the time of the incident at Mongero's residence, he was cooking dinner and observed three males walking up his street. He testified that he observed "two African American males," one of whom had short hair and the other of whom had longer hair that was tied back. He testified that these two males were accompanied by a Hispanic male. At trial, Mongero described the man who stabbed him in his side as a black male who had "long dreads with blond tips, average build, stocky, [with a] strong brow." During the trial, Mongero identified the defendant as the person who fit this description and who stabbed him in his bedroom. Thus, the court's finding was supported by the evidence and the rational inferences to be drawn therefrom.

Third, the defendant argues that, "[w]hile the court emphasized that Mongero identified the defendant multiple times, he only did so twice—once upon seeing the defendant's photo in the newspaper and then later at trial. Given its finding that his initial identification came from suggestive circumstances, it is illogical to construe that as strong evidence against the defendant." The defendant is unable to demonstrate that these findings are clearly erroneous. The evidence reflects that Mongero identified the defendant at least twice, once after seeing his photograph in the newspaper and, later, during the trial itself. Thus, the evidence supports the court's finding that Mongero identified the defendant "multiple times." The defendant's suggestion that the initial identification should be disregarded because it "came from suggestive circumstances" invites us to disregard the evidence presented at trial. As we discussed in part III of this opinion, the trial court found, and we agreed, that the identification was reliable and admitted without limitation as to its use by the jury. See *Gagliano* v. *Advanced Specialty Care, P.C.*, 329 Conn. 745, 759, 189 A.3d 587 (2018) ("[a]n exhibit offered and received as a full exhibit is in the case for all purposes . . . and is usable as proof to the extent of the rational persuasive

power it may have" (citation omitted; internal quotation marks omitted)). In light of the fact that a materiality analysis takes into account the entire record of the trial, the defendant's argument that it was clearly erroneous for the court to have relied on the out-of-court identification in evaluating the materiality of the suppressed *Brady* evidence is not persuasive.[21]

Separate from his argument that the foregoing findings were clearly erroneous, the defendant argues that the court's analysis of materiality was flawed because the court "misunderstood" his argument that, if the jury "knew that Williams had lied under oath to his superiors about completing his recertification training, they could have disbelieved that Mongero suddenly decided to cooperate and came to the police department on his own accord the minute he left the hospital. Instead, they might have concluded that he did so because he had been told at the hospital [that] he would not be charged for the drugs [the police found at his residence] if he cooperated. They could also have doubted Williams' testimony that he simply contacted Mongero to do a photo array. Rather, they could have concluded that Mongero agreed with Williams when Williams contacted him about seeing the newspaper [article] because he knew from the start that he would not be investigated [for his possession of illegal drugs] *only* if he cooperated, and that once the case resurfaced years later, he felt compelled to state that the defendant was his attacker." (Emphasis in original.) Lastly, the defendant argues that the court's analysis of

---

[21]The defendant also challenges the propriety of the court having found that there was evidence "that the defendant's DNA was on the weapon recovered at the scene which also had Mongero's DNA . . . ." The basis for the defendant's challenge is unclear. He does not dispute "that [his] DNA was found in a mixture on the weapon used [to stab] Mongero" but, instead, argues that this was "not strong evidence given that there were several unidentified contributors on the weapon and the DNA analyst did not know how it got there." The defendant has not demonstrated that the court's finding was not supported by the evidence and, thus, clearly erroneous. The defendant made identity an issue in the case, and the evidence that his DNA was present on the knife used to stab Mongero, while not dispositive of his guilt, was nonetheless strong evidence that supported the verdict.

materiality was flawed because "it does not matter that the jury was aware of the cooperation agreement between Mongero and the state. The issue was whether Mongero was incentivized to identify the defendant in the first place, and not that there was a cooperation agreement entered into years later."

As stated previously, we review the trial court's findings of historical facts in connection with the defendant's *Brady* claim under the clearly erroneous standard of review. However, we undertake a plenary examination of whether, in light of the historical facts found, the suppressed evidence was material under *Brady*, and we do not defer to the court's determination that the suppressed evidence was not material. Nonetheless, we readily reject the defendant's argument that the court's legal analysis of the *Brady* issue was flawed because the court misunderstood the nuances of that argument. The defendant thoroughly set forth his arguments concerning materiality before the trial court. Contrary to the defendant's claim, the court's memorandum of decision reflects that the court squarely considered the defendant's theory of materiality, specifically, **(1)** that the suppressed evidence would have undermined Williams' testimony in the areas in which it conflicted with that of Mongero, **(2)** this ultimately would have led the jury to question whether Mongero's identification of him was accurate, and **(3)** the jury would have found that Mongero's identification of him was inaccurate because it was the result of his desire to assist the police and thereby avoid prosecution on charges related to his possession of illegal drugs.

In our plenary review of the entire record, we are not persuaded that the suppressed evidence concerning Williams would have cast the case in a different light or that the absence of the evidence deprived the defendant of a fair trial. The suppressed evidence was favorable to the defendant in that it tended to undermine Williams' credibility generally, but it does not follow that, if the evidence had been disclosed, the jury would have been likely to have disbelieved Williams' testimony in its entirety or would have concluded that Mongero did not

testify credibly with respect to his identification of the defendant. The defendant squarely placed before the jury the issue of whether Mongero's identification of him was motivated by his own self-interest, specifically, whether his cooperation with the state was the result of his desire to avoid prosecution for his possession of illegal drugs. The jury was well aware of the fact that Mongero had entered into a cooperation agreement with the state. Furthermore, the jury heard ample testimony concerning the circumstances under which Mongero cooperated with the police, informed Williams about the newspaper article, and provided Williams with a statement concerning his out-of-court identification of the defendant.

It is significant in our analysis that the suppressed evidence was factually unrelated to any aspect of Williams' investigation of the events underlying the defendant's conviction, let alone Mongero's out-of-court identification of the defendant. Although the suppressed evidence was favorable to the defendant, this does not mean that it was so compelling that, if it had been admitted into evidence, the jury likely would have disbelieved Williams' testimony in its entirety or, as the defendant suggests, would have disbelieved Williams' testimony concerning the circumstances surrounding Mongero's out-of-court identification of him. Furthermore, even if we were to agree that the evidence would have caused the jury to disbelieve Williams' testimony in its entirety, this does not mean that the jury likely would have disbelieved Mongero, who fully explained his reasons for cooperating with the police and providing the police with an identification of the defendant that, according to him, was honestly made.

Finally, even if the jury believed that Mongero's identification of the defendant was biased by his self-interest, the state presented other evidence from which it reasonably could have logically inferred that the defendant was the perpetrator of the crimes of which he was found guilty. The testimony of the defendant's neighbors, the results of the DNA testing of the knife, and the cell phone records corroborated a finding that Mongero accurately

had identified the defendant. See *State* v. *Bryan*, 193 Conn. App. 285, 318, 219 A.3d 477 (rejecting claim of materiality based on state's failure to disclose internal affairs records relating to police sergeant who was called as witness at trial because, "[e]ven if the defendant could have used the records to impeach [the witness'] credibility, there was overwhelming evidence adduced at trial supporting the defendant's conviction"), cert. denied, 334 Conn. 906, 220 A.3d 37 (2019); *Elsey* v. *Commissioner of Correction*, 126 Conn. App. 144, 160, 10 A.3d 578 ("[T]his was not a case in which the prosecution's case hinge[d] entirely on the testimony of [the witness in question] . . . . Rather . . . there was ample evidence to support the [defendant's] conviction. . . . Therefore, we cannot say that the fact that the state did not disclose the evidence . . . undermines our confidence in the jury's verdict . . . ." (Citations omitted; internal quotation marks omitted.)), cert. denied, 300 Conn. 922, 14 A.3d 1007 (2011). Thus, after taking into consideration the nature of the suppressed evidence, including Williams' role in the investigation of the crimes, we are not persuaded that the suppressed evidence was likely to have cast the whole case in such a different light as to undermine the confidence of the verdict.

For the foregoing reasons, we are not persuaded that it was reasonably probable that the disclosure of the exculpatory evidence would have affected the outcome of the trial. Because a *Brady* violation did not occur, the court properly exercised its discretion in denying the motion for a new trial.

The judgment as to the conviction of assault in the second degree as an accessory is vacated; the judgment is affirmed in all other respects.

In this opinion the other judges concurred.